# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39825**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Sean W. HARRINGTON**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 14 October 2021

————————————

*Military Judge*: Christopher M. Schumann.

*Sentence*: Sentence adjudged 1 July 2019 by GCM convened at Cannon Air Force Base, New Mexico. Sentence entered by military judge on 30 July 2019: Dishonorable discharge, confinement for 14 years, and reduction to E-1.

*For Appellant:* Major M. Dedra Campbell, USAF; Major Matthew L. Blyth, USAF.

*For Appellee*: Lieutenant Colonel Matthew J. Neil, USAF; Major Zachary T. West, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and CADOTTE, *Appellate Military Judges*.

Judge RICHARDSON delivered the opinion of the court, in which Senior Judge POSCH joined. Judge CADOTTE filed a separate opinion concurring in the result.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

RICHARDSON, Judge:

A general court-martial comprised of officer members convicted Appellant, contrary to his pleas, of one specification of involuntary manslaughter and one specification of communicating a threat in violation of Articles 119 and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 919, 934, *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*).[1,2] Also, Appellant was found guilty, consistent with his pleas, of one specification of divers use of cocaine and one specification of divers use of marijuana, both in violation of Article 112a, UCMJ, 10 U.S.C. § 912a, *Manual for Courts-Martial, United States* (2012 ed.).[3] Additionally, consistent with his pleas, Appellant was found not guilty of one specification of aggravated assault alleged in violation of Article 128, UCMJ, 10 U.S.C. § 928 (2016 *MCM*).[4]

The court-martial sentenced Appellant to a dishonorable discharge, 14 years of confinement, and reduction to the grade of E-1. The convening authority did not disturb the adjudged sentence.

Appellant, through counsel, raises 12 assignments of error, several of which we have reordered. Three relate to Appellant's conviction for involuntary manslaughter: (1) whether the military judge abused his discretion with his instructions to the members on false exculpatory statements and accident; (2) whether the circuit trial counsel improperly argued uncharged misconduct and

---

[1] All charged offenses in this case occurred prior to 1 January 2019, and were preferred and referred to court-martial after that date. Unless otherwise noted, all references in this opinion to the non-punitive articles of the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*).

[2] Appellant was charged with, and pleaded not guilty to, murder in violation of Article 118, UCMJ, 10 U.S.C. § 918 (2016 *MCM*), but was convicted of the lesser offense of involuntary manslaughter in violation of Article 119, UCMJ, 10 U.S.C. § 919 (2016 *MCM*). Nonetheless, the announced finding to this charge was "guilty" when it should have been announced as "not guilty, but guilty of a violation of Article 119." *See* R.C.M. 918(a)(2)(B). While the findings worksheet also had this error, we note the military judge told the members in his findings instructions that the lesser-included offense of involuntary manslaughter was a violation of Article 119. Appellant has not claimed prejudice from this error, and we find none.

[3] These offenses occurred between on or about 4 January 2014 and on or about 24 July 2017.

[4] Additionally, one charge and specification of voluntary manslaughter in violation of Article 119, UCMJ, 10 U.S.C. § 919 (2016 *MCM*), were withdrawn and dismissed after arraignment but before entry of pleas.

made improper comments during argument on the merits; and (3) whether Appellant's conviction is factually and legally sufficient. Appellant's counsel also asserts the following assignments of error: (4) whether Appellant's conviction for communicating a threat is factually and legally sufficient; (5) whether the military judge abused his discretion in denying a defense motion to dismiss for the Government's failure to disclose an alleged relationship between the trial counsel and an investigative agent; (6) whether Appellant was denied a fair trial because court members heard numerous instances of impermissible testimony; (7) whether the military judge abused his discretion by allowing a victim's parents to deliver unsworn statements in a question-and-answer format with trial counsel; (8) whether the military judge abused his discretion by denying a defense request to instruct the members that the maximum punishment for involuntary manslaughter was ten years; (9) whether the trial counsel made improper arguments in sentencing; (10) whether Appellant's sentence was inappropriately severe; (11) whether the convening authority erred by failing to take action on the sentence; and (12) whether the cumulative effect of errors substantially impaired the fairness of Appellant's trial. Appellant personally[5] supplements issue (10), and raises three additional issues on appeal: (13) whether the Government denied him his right to a speedy trial under Article 10, UCMJ, 10 U.S.C. § 810, and Rule for Courts-Martial (R.C.M.) 707; (14) whether the military judge abused his discretion in denying a Defense motion to suppress Appellant's statements to police; and (15) whether the Government's post-trial processing delays warrant sentence relief.

We have carefully considered issues (6), (8), (12), (13), and (14), and we find they warrant neither further discussion nor relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). As to the remaining issues, we find no error that materially prejudiced Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

MJ was shot in the head with Appellant's .45-caliber handgun in Appellant's garage in the early morning of 5 July 2018. He died four days later. Appellant and MJ, a fellow Airman, were friends and co-workers.

At the time of the shooting, Appellant was facing court-martial charges for other misconduct, with trial scheduled to begin on 13 August 2018. Specifically, a year before the shooting, Appellant threatened one of his roommates, AB. While AB and their other roommate and fellow Airman, BI, were away at a meeting, and Appellant believed he had been "hogtied," Appellant sent AB

---

[5] *See United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

messages, including, "Whoever the sick sadistic mf who did this I'm going to kill," and "Tell me who did it and I'll go easy on you." AB and BI returned to their home. AB saw flat cord or twine "thrown about the yard," but saw no evidence that Appellant had been tied up. Appellant offered AB "one more chance" to tell Appellant who was sent to the house and tied him up. Appellant's gun was next to him during this conversation.

Appellant also used cocaine and marijuana, which Appellant admitted to law enforcement. AB witnessed Appellant's cocaine use.

On 25 July 2018, the convening authority withdrew and dismissed the threat, assault, and drug use charges from the general court-martial "to allow[ ] for further investigation of additional charges and consolidation of all known charges into one proceeding." Appellant's counsel requested a board to inquire into Appellant's mental responsibility and capacity under R.C.M. 706; the special court-martial convening authority granted this request on 1 November 2018. All charges in this case were preferred on 3 January 2019 and examined pursuant to Article 32, UCMJ, 10 U.S.C. § 832, before referral to trial by general court-martial on 27 February 2019. Appellant was arraigned 12 days later. Appellant was in pretrial confinement from 5 July 2018 until he was sentenced on 1 July 2019; his sentence to confinement was credited with these 361 days.

## II. DISCUSSION

### A. Involuntary Manslaughter

#### 1. Additional Background

Appellant was assigned to Cannon Air Force Base (AFB), New Mexico, and lived in nearby Clovis, New Mexico. On 4 July 2018, Appellant invited three friends to his residence: MJ (a fellow enlisted Airman), and KM and AJ, two civilian women. Over the course of the evening, the group ate, drank, and watched fireworks. By approximately 0100, KM and AJ had left, leaving MJ and Appellant alone in the garage.

Appellant called 911 at around 0215. Below are some of the relevant portions of the exchange:[6]

> [Appellant]: My friend was playing with a f[**]king gun.
>
> . . .

---

[6] These statements are taken from the transcript of the trial. Our review of the audio recording reveals the transcript is slightly, but not substantially, different.

911 Operator: Did he shoot himself? [Silence.] I need to know. Did he shoot himself?

[Appellant]: I don't know.

911 Operator: You don't know?

Shortly thereafter officers from the Clovis Police Department (CPD) arrived on the scene. The following separate exchanges occurred between CPD officers and Appellant, each captured on a bodycam video:

CPD Officer: Were you in here when it happened?

[Appellant]: Yes.

CPD Officer: Yes.

[Appellant]: Sort of. I don't know, man. I don't know.

And:

CPD Officer: Were you in here when this happened?

[Appellant]: Yes, well, sort of. I don't know, man. I don't know.

CPD Officer: Did you watch him shoot himself?

[Appellant]: Everything happened so fast.

Appellant was taken to the CPD station. He was provided a *Miranda* warning[7] and agreed to answer questions. Appellant made the following statements about the shooting:

I grabbed that gun from him and then it discharged; that's about the closest thing I got in my mind that happened at this point. Next thing you know, he's on the ground, he's bleeding out, and I'm calling the police.

. . .

So I grabbed it from—the gun from him and it discharged.

. . .

I thought I—when I grabbed it I thought I pointed it up enough. That's what we're taught in—finger discipline.

. . .

I wasn't sort of thinking is all. I wasn't thinking like a gun owner at all.

---

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

. . .

> I was so confident, I guess, 'cause the gun wasn't firing at all that night.

Appellant also made one reference to grabbing the gun from MJ because of MJ saying something about hurting the dog.[8] Appellant also told CPD officers he was "blurry" about the details of how he was holding the gun when he grabbed it, but he was able to provide a demonstration of how he held it "pointed up."

The CPD officers who arrived on scene found a Glock 21 handgun, a live round, and a spent casing—all .45 caliber—on a work bench a few feet away from where MJ was lying on the ground. MJ received care from medical personnel, was transported to a local hospital, and was then air-lifted to a larger hospital, where he died four days later.

Due to Appellant's military status, CPD alerted the Air Force Office of Special Investigations (AFOSI). Initially, CPD had primary investigative jurisdiction over the shooting. Around mid-July 2018, CPD transferred the investigation, evidence, and jurisdiction to the Air Force.

At trial, the Prosecution presented testimony from KM (one of the friends who was with Appellant and MJ in the garage before the shooting), four officers from CPD, two AFOSI agents, three examiners from the United States Army Criminal Investigation Laboratory (USACIL), a crime-scene-reconstruction expert, and a forensic pathologist. The Prosecution also presented, *inter alia*, Appellant's 911 call; two CPD bodycam videos showing interactions between Appellant and officers after officers arrived on scene; the seized Glock 21, bullets, and spent casings; the clothes and sandals Appellant was wearing when CPD officers arrived; expert reports relating to DNA from Appellant's clothes, fingerprints (or lack thereof), firearms and ammunition, and crime-scene reconstruction; and MJ's autopsy report and death certificate.

### 2. False Exculpatory Statement Instruction

#### a. Additional Background

The Defense did not object to the admission into evidence of audio of Appellant's 911 call and bodycam videos of the police response to Appellant's garage. The Defense moved to suppress the contents of Appellant's interview at the police station; after this motion was denied, Appellant did not object to the video's introduction at trial.

---

[8] KM testified that MJ was familiar with the dog. On the night MJ was shot, he was doing tricks with the dog, and giving her beef jerky treats.

As the military judge was finalizing the instructions he would give the members on findings, the Government requested an instruction on false exculpatory statements of Appellant. The Defense objected to the instruction, arguing Appellant's statements all were general denials of guilt. The military judge agreed with the Government, explaining:

> I believe the instruction is justified because, in this particular instance there is at least some evidence that the members could conclude after consideration, that after the alleged offense that is charged in [Charge II], that the accused made statements that were inconsistent with each other. In other words, he had made statements to include, and I will summarize here, that [MJ] had shot himself, he had made statements that he was unaware of what happened, and he had made statements that [MJ] was holding the gun and that the accused tried to take the gun away from him because of a perceived threat to the accused's dog. The fact that the accused had made multiple statements to different law enforcement individuals that were inherently inconsistent with each other, I believe that that contradiction is what provides independent evidence of the falsity -- potential falsity of those statements. At least enough to warrant the inclusion of the false exculpatory statement instruction.

The military judge instructed the members that Appellant "may have made contradictory statements" about the offense alleged in Charge II. The military judge continued:

> Conduct of an accused, including statements made and acts done upon being informed that a crime may have been committed or upon being confronted with a criminal charge, may be considered by you in light of other evidence in the case in determining the guilt or innocence of the accused. If an accused voluntarily offers an explanation or makes some statement tending to establish his innocence, and such explanation or statement is later shown to be false, you may consider whether this circumstantial evidence points to a consciousness of guilt. You may infer that an innocent person does not ordinarily find it necessary to invent or fabricate a voluntary explanation or statement tending to establish his innocence. The drawing of this inference is not required.

> Whether the statement was made, was voluntary, or was false is for you to decide. Whether evidence as to an accused's voluntary explanation or statement points to a consciousness of guilt,

and the significance, if any, to be attached to any such evidence,
are matters for determination by you, the court members.

Appellant repeats this claim on appeal. Specifically, Appellant claims the
military judge abused his discretion by providing the members an instruction
on false exculpatory statements. He argues "the military judge's conclusion that
Appellant's statements are inherently inconsistent is unsupported by the evi-
dence." Further, he argues the military judge used an incorrect standard of "po-
tentially false" and was required to make a predicate finding that some evidence
of falsity was admitted. The Government argues "those statements contradicted
each other, and the mutually exclusive nature of those contradictions proved
their falsity."

### b. Law

Whether a military judge properly instructs the court members is a ques-
tion of law we review de novo. *United States v. Hibbard*, 58 M.J. 71, 75
(C.A.A.F. 2003) (citation omitted). A military judge's decision to provide an in-
struction is reviewed for an abuse of discretion. *United States v. Anderson*, 51
M.J. 145, 153 (C.A.A.F. 1999) (citation omitted).

"[F]alse statements by an accused in explaining an alleged offense may
themselves tend to show guilt" but a "general denial of guilt does not demon-
strate any consciousness of guilt." *United States v. Colcol*, 16 M.J. 479, 484
(C.M.A. 1983) (citation omitted). "Moreover, in order to decide that an ac-
cused's general denial of illegal activity is false, the factfinder must decide the
very issue of guilt or innocence; and so the instruction would only tend to pro-
duce confusion because of its circularity." *Id.*

When raised by the evidence, the military judge may provide the members
a general instruction on false exculpatory statements. *See United States v.
Opalka*, 36 C.M.R. 938, 944–45 (A.F.B.R. 1966) (approving the instruction as a
correct statement of law and finding that failure to identify particular state-
ments was not prejudicial).

### c. Analysis

We find the instruction was raised by the evidence, and the military judge
did not abuse his discretion when he provided the instruction.

First, we find the military judge did not err when he described Appellant's
statements as "potentially false." In determining whether to provide court mem-
bers an instruction on false exculpatory statements, a military judge does not
determine whether a statement was, in fact, false. Instead, the military judge's
role is to determine whether the factfinder could reasonably conclude from the
evidence that the statement was false and tended to show consciousness of
guilt. Thus, the military judge was correct when he instructed the members

that "[w]hether the statement was made, was voluntary, or was false" was "for [them] to decide."

Contrary to Appellant's assertions, we do not find that Appellant's statements conveyed only a general denial of guilt, and we do find their potential falsity was supported by the evidence. Appellant professed a lack of memory during some statements, but provided details in other statements. He stated MJ was "playing with a gun" when he was shot, but also that Appellant grabbed the gun from MJ and it discharged. Members could reasonably find these statements were made, that they were mutually inconsistent, and that if all could not be true, then one or more must be false. Furthermore, in this case, any such falsity would directly relate to the ultimate issues involved in the alleged offense of murder and its lesser-included offense of involuntary manslaughter. That Appellant did not remember then did remember, or recalled differing versions of what happened to cause MJ to be shot and killed, could be considered circumstantial evidence pointing to his consciousness of guilt. The military judge did not err in providing the court members this instruction.

### 3. Accident Instruction

Appellant claims on appeal that "[t]he unnecessary inclusion of 'sober' in the instruction for the defense of accident served to undermine the defense's viability" and "[left] the impression that his intoxication made the defense of accident unavailable." We find the military judge did not abuse his discretion in providing the tailored instruction on the defense of accident.

#### a. Additional Background

Before trial, the Defense indicated it intended to put on a defense of accident, and during trial, it adduced evidence to support such a defense. Additionally, both parties introduced evidence that Appellant and MJ were drinking alcohol before the shooting.[9]

In its case in chief, the Defense introduced evidence that Appellant was drunk when talking to the responding police officers. Specifically, it introduced a bodycam video in which the officer can be heard saying, "He's so drunk right now. He is slurring his speech. I told her to stop asking questions."

---

[9] The Defense did not ask that evidence of Appellant's alcohol use be excluded. However, the military judge granted the Defense motion to exclude evidence under Mil. R. Evid. 404(b) that Appellant became aggressive when he drank alcohol to excess and that Appellant once held up an individual at knifepoint or gunpoint after Appellant had been drinking.

Thereafter, the Government requested the military judge modify his draft instruction on accident by adding the word "sober" to the reasonably prudent person standard, "especially given the body cam footage that was just published." The Defense objected, stating the military judge's draft language came "out of the bench book"[10] and was not inaccurate; the change was not prompted by the members; and the Government wanted the change because it "would be more convenient" for its case.

In his analysis on the record, the military judge analogized to the law guiding mistake and ignorance, "where the courts . . . have made it clear that you cannot consider voluntary intoxication when deciding whether or not a belief or ignorance was reasonable." The military judge decided to add the word "sober," explaining:

> I'll just note that the purpose of the instructions is to ensure that the members properly consider the evidence within the confines of the law. And again, I do believe that adding the word sober is an appropriate characterization of the standard for assessing whether or not an individual acted with an amount of care or safety for others that a reasonably prudent sober person would have used, under those circumstances.

In his instructions to the members on accident—for both the charged offense and the lesser offense of which Appellant was convicted—the military judge advised, *inter alia*:

> Second, the accused must not have been negligent. In other words, the accused must have been acting with the amount of care for the safety of others that a reasonably prudent sober person would have used under the same or similar circumstances. . . .
>
> . . . If you are satisfied beyond a reasonable doubt that the accused did not act with the amount of care for the safety of others that a reasonably prudent sober person would have used under the same or similar circumstances, the defense of accident does not exist.

Although the military judge added the word "sober" to his instruction on accident, he did not add it to his instruction on the element of involuntary manslaughter that requires that an accused act with culpable negligence.

---

[10] We understand this to be a reference to the *Military Judges' Benchbook*, Dept. of the Army Pamphlet 27–9.

### b. Law

Accident is a defense to the offense of involuntary manslaughter and has three elements. First, there must be evidence "that the accused was engaged in an act not prohibited by law, regulation, or order;" second, the lawful act "must be shown . . . to have been performed in a lawful manner, i.e., with due care and without simple negligence; and" third, it must be shown that "this act was done without any unlawful intent." *United States v. Arnold*, 40 M.J. 744, 745–46 (A.F.C.M.R. 1994) (citing *United States v. Van Syoc*, 36 M.J. 461, 464 (C.M.A. 1993)); *see also* R.C.M. 916(f) ("A death, injury, or other event which occurs as the unintentional and unexpected result of doing a lawful act in a lawful manner is an accident and excusable.").

"Due care" is "such care as would be exercised by an ordinarily prudent [person] when sober." *United States v. Bragg*, 4 C.M.R. 778, 782 (A.F.C.M.R. 1952) (citation omitted); *see also* Restatement (Second) of Torts § 283C cmt. d (Am. Law Inst. 1965) (noting that if a drunken person's "conduct is not that of a reasonable man who is sober, his voluntary intoxication does not excuse" conduct that would otherwise be negligent). The concept of "reasonably prudent person" is an objective standard. "The actor is required to do what this ideal individual would do in his place. The reasonable man is a fictitious person, who is never negligent, and whose conduct is always up to standard." Restatement (Second) of Torts § 283 cmt. c (Am. Law Inst. 1965).

When each element of the defense of accident is raised by the evidence, the prosecution has the burden of disproving the defense beyond a reasonable doubt. *See* R.C.M. 916(b)(1); *see also United States v. Ferguson*, 15 M.J. 12, 17 (C.M.A. 1983) (finding that "if the defense involves several elements of proof, the record must contain some evidence on each of those elements" for an accused to be entitled to an instruction on accident).

### c. Analysis

We disagree with Appellant that the inclusion of the word "sober" in the military judge's instructions left an impression with the members that the defense of accident was unavailable. The military judge did not tell the members that an intoxicated person cannot act with the same care as a reasonably prudent person would. Instead, he advised them that they should consider Appellant's actions against the standard of what a reasonably prudent sober person would do. At trial, Appellant did not request the military judge explain this distinction to the members. We find the instruction was not confusing and was an accurate statement of the law. As the members otherwise could have been confused about how Appellant's voluntary intoxication related to the defense of accident, we find the military judge did not abuse his discretion in providing them the tailored instruction.

Even if the military judge erred, we find the result would not have been different. The defense of accident requires that an accused must not have acted with even simple negligence. Involuntary manslaughter requires that an accused act with culpable negligence—a degree of carelessness greater than simple negligence. When instructing the members on this element of culpable negligence, the military judge did not add the word "sober" to the reasonably prudent person standard. The members then convicted Appellant of involuntary manslaughter. By finding beyond a reasonable doubt that Appellant acted with culpable negligence, whether using a drunk or sober standard, the court members rejected the claim that Appellant acted non-negligently. Thus, in finding the culpable negligence element proved beyond a reasonable doubt, the members would not have found the defense of accident relieved Appellant of responsibility.

Having found no error in the accident instruction, we consider Appellant's related claim involving negligence[11] when we consider the claims of improper findings argument and legal insufficiency.

**4. Findings Argument**

Appellant contends that the Prosecution argued several of Appellant's acts on 4–5 July 2018 were "inherently dangerous," thereby confusing the members about which "inherently dangerous act" was an element of the charged offense.[12] Appellant rhetorically asks on appeal, "What specifically did [Appellant] do that was either an inherently dangerous act or an act of culpable negligence?" We find the Prosecution clearly answered this question during findings argument at trial. We find neither error nor prejudice. Additionally, we provide no relief for Appellant's claim that "the [circuit trial counsel] improperly attacked [Appellant's] comments during the interrogation."

*a. Additional Background*

The military judge provided the members with instructions relating to "inherently dangerous" acts. In identifying the elements of murder that the Prosecution needed to prove beyond a reasonable doubt, the military judge stated:

---

[11] Specifically, Appellant argues that the circuit trial counsel's findings argument demonstrates the error was not harmless; it "cast confusion on the role of drinking alcohol in the shooting," blurring the concepts of "inherently dangerous act"—an element of the charged offense of murder—and "reasonably prudent person"—part of the negligence component of the defense of accident.

[12] "Any person . . . who, without justification or excuse, unlawfully kills a human being when he . . . is engaged in an act that is inherently dangerous to another and evinces a wanton disregard of human life . . . is guilty of murder." Article 118, UCMJ (2016 *MCM*). Article 119, UCMJ, does not address "inherently dangerous" acts.

(2) That [MJ's] death resulted from the act of the accused in shooting [MJ] in the head with a handgun . . . ;

(3) That this act was inherently dangerous to another, that is, one or more persons, and evinced a wanton disregard for human life[.]

In her findings argument relating to the shooting, the circuit trial counsel made several references to what she described as "inherently dangerous" acts:

At some point, after [KM] left, [Appellant] went to his bedroom and got a loaded 45 caliber Glock handgun while he was drunk. If that alone isn't inherently dangerous, then certainly trying to fire it while you were drunk is. Those are the accused's words. That's what he said. "Yeah I went to my room and I got the gun. I wanted to shoot it in the air.[ ] It's a family tradition. We go out drinking all day, I've been drinking for eight hours, and I'm going to go out in a neighborhood where I have small children as neighbors, and I'm gonna shoot off guns in the air.["] That is absurd and that is inherently dangerous, and it is a wanton disregard for human life.

Soon thereafter, the Defense made its only objection during the Prosecution's arguments on findings. The circuit defense counsel explained: "The court's instructions [are] that the act is the shot that struck [MJ's] head. To argue that getting the gun from the bedroom is the inherently dangerous act is just not how this case is charged. It's designed to inflame the passions." The circuit trial counsel responded, "[W]e're going to argue that it was the pulling of the trigger that's the act in the elements but I think that we -- that it's fair game to argue that just getting a loaded firearm out while drinking is inherently dangerous." The military judge overruled the objection. He explained: "I think the circumstances surrounding the alleged offense will be considered fairly by the members as facts and circumstances admitted into evidence. They can take into consideration all the facts and circumstances when deciding whether or not the government has met their burden on that element."

The circuit trial counsel next argued what she would later specify was the charged inherently dangerous act. In explaining why they should conclude Appellant lied in the 911 call when he said he did not know whether his friend shot himself, circuit trial counsel argued Appellant would have been thinking, "How am I going to explain that we were drunk, messing around with a 45 caliber loaded handgun in a garage and I pulled the trigger?"

Later, the circuit trial counsel was unambiguous in her argument about the charged inherently dangerous act: "And the intentional act that is inherently dangerous is putting your finger on a trigger and pulling it, even if it's

pointed up in the air. Even if it's a threat. Even if you didn't think it was going to fire." And again: "The accused pulled the trigger, and pulling the trigger of a firearm of a loaded firearm in a closed garage is an act inherently dangerous to another with wanton disregard for human life." And again: "Just remember, the act is pulling the trigger." And in her rebuttal argument: "All you need to know is that he took an act, he did an act, he pulled the trigger. That's the act. And it was so inherently dangerous to another and it was likely to cause death or grievous bodily harm. And that result is death."

The circuit trial counsel was not as clear about the inherently dangerous act when she was arguing how the evidence proved elements of the offense of murder:

> We've had plenty of medical testimony that he was shot in the head with a handgun. That is the cause of death. And the accused['s] own words said that he had it, "I snatched the gun away, I grabbed the gun, I thought I pointed it up high enough. I know finger discipline, I was taught that." So was this act inherently dangerous to another? That is one or more persons in it evinced a wanton disregard for human life. So basically it showed a wanton disregard for human life. Yeah, yes. Because if you look at the firearm again, you don't have to be a gun owner or attend a gun safety class to know that you don't point a loaded firearm at someone. You don't get a loaded firearm out when you've been drinking. You should never have a loaded firearm out, unless you're on the range or doing something with it, but at a party where you've been drinking all day, to bring it out and try to shoot it in the air, put it on the workbench? No. But certainly to pull the trigger back? Even as what you think is going to be an empty threat. That is a wanton disregard for human life. The accused knew that death or great bodily harm was a probable consequence. Sure, it's a loaded firearm if you pull the trigger. He says, you treat every gun like it's loaded. You have to know that the probable consequence of pulling the trigger is that a bullet can come out, and if it's pointed in the direction of someone, that could hit someone and kill them, or at least cause grievous bodily harm. And in the confines of a closed garage, the police testified that when they got there the garage door was down. So the fact that you're even pulling the trigger in a closed garage? Think about it. Even if it's not pointed at someone, the ricochet of that -- that alone could cause death or grievous bodily harm. And that it was unlawful. Of course it was unlawful. He's not a cop acting pursuant to any duties. He's out drinking at a Fourth of July party playing with a loaded gun. It's unlawful.

The Defense did not object to this argument.

In its own argument in findings, when speaking about "an inherently dangerous activity," the Defense suggested the Government did not prove beyond a reasonable doubt that Appellant—and not MJ—was the one who pulled the trigger. The Defense did not address any other potential inherently dangerous act.

In addition to his claims of error about the nature of the inherently dangerous act, Appellant identified what he claims were improper arguments relating to his statements to investigators, none of which drew an objection:

> So what does he say? Well I would ask you to watch at the beginning when the officer first walks in. Now he's been held overnight because he shot his friend, and the first thing he comments on is not, ["H]ey how's he doing, what's going on, I'm freaking out, I can't believe this, it's a horrible accident, he was trying to do something stupid with the gun and I was wrestling it away.["] No, it was, ["Y]ou go to Notre Dame man? Nice T-shirt.["] Really?
>
> . . . .
>
> This is what he thinks about when he shot his friend in the face, "but when all the s[**]t went down, I think I had some [ammunition] in my pocket." ["]When all this s[**]t went down?["] You shot your friend in the head and that's the cavalier attitude you're going to take about this interview? It's careless. Just like he was careless and reckless with the gun the night before, ["]when all this s[**]t went down.["]

### b. Law

When preserved by objection, we review de novo allegations of improper argument to determine whether the military judge's ruling on the objection constituted an abuse of discretion. *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citations omitted). In doing so, we review any improper argument for prejudicial error. *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018) (citations omitted).

When no objection was made at trial, we review for plain error. *Id.* "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *Id.* at 401 (quoting *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005)).

In analyzing prejudice from a prosecutor's improper argument, we consider: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *Andrews*, 77 M.J. at 402 (quoting *Fletcher*, 62 M.J. at 184). We do not review

counsel's words in isolation; we review the argument "within the context of the entire court-martial." *United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000) (citations omitted).

"Improper argument is one facet of prosecutorial misconduct." *Sewell*, 76 M.J. at 18 (citing *United States v. Young*, 470 U.S. 1, 7–11 (1985)). "Trial prosecutorial misconduct is behavior by the prosecuting attorney that 'oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *Fletcher*, 62 M.J. at 178 (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). Such conduct "can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Voorhees*, 79 M.J. 5, 10 (C.A.A.F. 2019) (quotations and citation omitted). The trial counsel may appropriately "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *Baer*, 53 M.J. at 237 (citation omitted). She may not, however, "cross[ ] the exceedingly fine line which distinguishes permissible advocacy from improper excess" and use language that is "more of a personal attack on the defendant than a commentary on the evidence." *Fletcher*, 62 M.J. at 183 (internal quotation marks and citation omitted.)

When evidence has been introduced that indicates "similarities between a charged offense and prior conduct, whether charged or uncharged, to show . . . propensity" but was not admitted using a specific exception in our rules of evidence allowing for propensity evidence, counsel may not argue propensity. *United States v. Burton*, 67 M.J. 150, 152–53 (C.A.A.F. 2009).

### c. Analysis

Appellant preserved his objection to the portion of circuit trial counsel's argument that could imply the charged inherently dangerous act was getting the firearm from the bedroom. We consider whether the military judge abused his discretion in overruling that objection. We review the portions of the argument Appellant now claims were improper, but to which Appellant did not object at trial, for plain error. If we find error, plain or otherwise, we consider whether Appellant was prejudiced.

### i) Inherently dangerous act

Considering the circuit trial counsel's argument as a whole, we find her statement that Appellant getting the firearm from the bedroom was an inherently dangerous act was not improper. After the Defense objected, circuit trial counsel clarified—in front of the members—that "it was the pulling of the trigger that's the act in the elements." She then argued it was "fair game to argue that just getting a loaded firearm out while drinking is inherently dangerous."

With these two statements seemingly in opposition, the military judge ruled the circuit trial counsel was arguing "facts and circumstances" the members could consider "when deciding whether or not the [G]overnment has met their burden on that element." We find the military judge did not abuse his discretion by overruling the Defense objection to the Prosecution's argument about getting the firearm from the bedroom, and by allowing the Prosecution to argue facts and circumstances leading up to the act of pulling the trigger.

Next, we consider whether the portions of the circuit trial counsel's argument that stated or implied that other actions besides pulling the trigger were inherently dangerous acts was improper. We find those portions do not constitute plain or obvious error. Again, considering the argument in context and as part of the whole, we do not agree with Appellant that circuit trial counsel "obscured the key issue" of whether or when Appellant was engaged in an inherently dangerous act. While the circuit trial counsel's argument did not neatly compartmentalize the evidence supporting each element, she made abundantly clear that the Prosecution had to prove Appellant pulled the trigger to meet the element of murder concerning an inherently dangerous act.

Finally, any error on this issue would be harmless because the members did not find Appellant guilty of murder, but rather, found him guilty of an offense that does not require proof of an inherently dangerous act. The military judge instructed the members that:

> The offense charged, murder, and the lesser included offense of involuntary manslaughter, differ in that the offense charged requires as elements that you be convinced beyond a reasonable doubt that the act was inherently dangerous to another, that is, one or more persons, and evinced a wanton disregard for human life, and that the accused knew that death or great bodily harm was a probable consequence of the act, whereas the lesser offense of involuntary manslaughter does not include such elements, but does require that this act amounted to culpable negligence.

Thus, even if trial counsel's argument about "inherently dangerous act" was improper, Appellant did not suffer prejudice. He was not convicted of an offense with such an element.

The Government repeatedly made clear to the members that the inherently dangerous act they were proving beyond a reasonable doubt was Appellant pulling the trigger, and the members were advised they could consider evidence of Appellant's actions leading up to the shooting in determining whether pulling the trigger was an inherently dangerous act. We find no error and that Appellant suffered no prejudice.

### *ii) Appellant's Character – Statements to Investigators*

Appellant asserts that the circuit trial counsel improperly argued "bald propensity evidence for his 'character' of being careless," which included "an improper slight towards [Appellant]." Specifically, Appellant finds fault with circuit trial counsel's argument that Appellant's word choices in speaking to investigators were "careless [j]ust like he was careless and reckless with the gun the night before, [']when all this s[**]t went down.[']" Assuming error in the Prosecution arguing propensity, we find no error in the comments on Appellant's attitude, and we find no prejudice under a plain error standard of review.

The Prosecution's argument made the analogy that it was more likely Appellant was careless in pulling the trigger of the firearm because he was careless in his words to investigators. However, we find no material prejudice to a substantial right and thus no plain error. Unlike in *Burton*, where the trial counsel "encouraged panel members to compare the similarities of two charged offenses, pointed out several specific examples, and argued that these similarities showed Appellant's propensity to commit such crimes," *Burton*, 67 M.J. at 152, here the improper argument was limited to a single comment and was not part of a broader argument about character for carelessness. Also, the fact that the Defense did not object "is some measure of the minimal impact of a prosecutor's improper comment." *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999) (internal quotation marks and citations omitted). The military judge did not *sua sponte* provide an instruction on considering propensity or character evidence, and none was requested, which demonstrates the low severity of the misconduct but also the lack of measures to cure it. Finally, the weight of the evidence was substantial, as discussed *infra* with respect to legal sufficiency. Thus, having considered the factors in *Fletcher*, 62 M.J. at 184, we find no prejudice.

Appellant, in his assignment of error, quoted circuit trial counsel's argument about Appellant's attitude when he first met with investigators, but did not specifically claim it was error. Nevertheless, we also consider the propriety of the Prosecution's argument that instead of asking about the welfare of his friend who was just shot in the head, or "freaking out," or explaining how the shooting was "a horrible accident," Appellant calmly complimented the investigator on his t-shirt.

We do not find the comments about carelessness and the t-shirt compliment to be "more of a personal attack on [Appellant] than a commentary on the evidence." *Voorhees*, 79 M.J. at 11 (quoting *Fletcher*, 62 M.J. at 183). For the most part, the circuit trial counsel parroted Appellant's own words—which were not themselves disparaging. These comments on Appellant's attitude related to the theme of circuit trial counsel's argument: "the truth is easy, the truth is quick, and the truth is consistent." The thrust of this argument was twofold: (1) the

members should view Appellant's easy or quick answers to investigators' questions as fact or sincere emotion, and (2) the members should view Appellant's confused, vague, or non-responsive answers to investigators' questions as Appellant's efforts to conceal the truth or concoct a version of events because the truth was harmful to Appellant. In a closing argument where the Prosecution properly commented on Appellant's lack of truthfulness regarding the facts and circumstances surrounding the shooting, we do not find that these brief comments on Appellant's attitude were an attempt "unduly to inflame the passions or prejudices of the court members." *United States v. Clifton*, 15 M.J. 26, 30 (C.M.A. 1983) (citations omitted). We do not find this comment evinced prosecutorial misconduct.

### 5. Legal and Factual Sufficiency

Appellant asserts several bases in challenging the legal and factual sufficiency of his conviction for involuntary manslaughter. First, he argues that the actual act which constituted the crime of which the court members found Appellant guilty is ambiguous. Appellant points to circuit trial counsel's arguments to the members in findings, discussed *supra*, describing various "inherently dangerous acts" relating to the charged offense of murder—one of which was pulling the trigger. Next, Appellant claims the evidence did not demonstrate beyond a reasonable doubt that Appellant pulled the trigger. Finally, he argues the defense of accident and the possibility of a superseding cause should absolve him of criminal responsibility. We find Appellant's conviction for involuntary manslaughter both legally and factually sufficient.

#### a. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "the standard for legal sufficiency involves a very low threshold to

sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (quotation marks, brackets, and citation omitted), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019). "[T]he government is free to meet its burden of proof with circumstantial evidence." *King*, 78 M.J. at 221 (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

The elements of involuntary manslaughter in violation of Article 119, UCMJ, a lesser-included offense of murder as charged in the Specification of Charge II, include that: (1) MJ is dead; (2) MJ's death resulted from the act of Appellant shooting MJ in the head with a handgun; (3) the killing of MJ by Appellant was unlawful; and (4) Appellant's act constituted culpable negligence. *See* 2016 *MCM*, pt. IV, ¶ 44.b.(2).

Regarding the second element—whether the death was the result of an appellant's act—we consider proximate cause. "To be proximate, an act need not be the sole cause of death, nor must it be the immediate cause -- the latest in time and space preceding the death. But a contributing cause is deemed proximate only if it plays a material role in the victim's decease." *United States v. Romero*, 1 M.J. 227, 230 (C.M.A. 1975) (citations omitted). "Further, an intervening cause excuses an accused from his criminally negligent conduct when 'the second act of negligence looms so large in comparison with the first, that the first is not to be regarded as a substantial factor in the final result.'" *United States v. Lingenfelter*, 30 M.J. 302, 307 (C.M.A. 1990) (quoting *United States v. Cooke*, 18 M.J. 152, 154 (C.M.A. 1984)).

"Culpable negligence" is "a negligent act or omission accompanied by a culpable disregard for the foreseeable consequences to others of that act or omission." 2016 *MCM*, pt. IV, ¶ 44.c.(2)(a)(i). "We apply an objective test in determining whether the consequences of an act are foreseeable." *United States v. McDuffie*, 65 M.J. 631, 635 (A.F. Ct. Crim. App. 2007) (citing *United States v. Riley*, 58 M.J. 305, 311 (C.A.A.F. 2003), and *United States v. Oxendine*, 55 M.J. 323, 326 (C.A.A.F. 2001)). "The test for foreseeability is whether a reasonable person, in view of all the circumstances, would have realized the substantial and unjustifiable danger created by his acts." *Oxendine*, 55 M.J. at 325 (internal quotation marks and citation omitted).

"Acts which may amount to culpable negligence include negligently . . . pointing a pistol in jest at another and pulling the trigger, believing, but without taking reasonable precautions to ascertain, that it would not be dangerous." 2016 *MCM*, pt. IV, ¶ 44.c.(2)(a)(i).

### b. Analysis

Appellant asserts that the evidence presented does not prove beyond a reasonable doubt that he pulled the trigger. The issue, however, is whether Appellant was the proximate cause of the trigger being pulled in a culpably negligent manner resulting in Appellant shooting MJ.

Appellant's own admissions are sufficient evidence. Appellant admitted he "grabbed the gun from [MJ]" and thought he (Appellant) "pointed it up enough" before it discharged. In the light most favorable to the Prosecution, these words suggest Appellant had control of the firearm when MJ was shot, and therefore MJ's death resulted from a culpably negligent act of Appellant.

Moreover, the evidence indicates a very low probability that MJ pulled the trigger. When the 911 operator asked whether MJ shot himself, Appellant said he did not know the answer. He could not answer similar questions from CPD officers. The investigation revealed no evidence that MJ was holding the firearm *when it discharged*. Sergeant JG was among the first CPD officers to arrive at the scene. He testified regarding what self-inflicted wounds typically look like:

> During similar incidents and most responses, the wound that I observed that night wasn't consistent with most self-inflicted gunshot wounds that I've ever seen over my career. That being said, GCR[13] gunshot residue, powder [b]urns, muzzle impressions, things that you would normally see if somebody was intending to commit suicide.

AFOSI Special Agent (SA) AC testified as an expert in shooting-incident reconstruction and crime-scene re-creation. She opined that MJ would have been standing when he was shot, and the bullet traveled in a "path . . . upward at a 38-degree angle." A different expert in shooting-incident reconstruction concurred in her report. That expert opined that the muzzle was 3–12 inches from the point of impact on MJ. The evidence indicated MJ was standing and facing the part of the bench where the firearm was found when he was shot.

Similarly, the evidence indicates a very low likelihood that the gun discharged without the trigger being pulled. An expert in firearms examination,

---

[13] "GCR" is not explained in the record. It likely was a misspeak of "GSR," an acronym for "gunshot residue." The exact meaning is not necessary for our analysis.

shooting-incident reconstruction, and pattern analysis testified that to make the gun fire, one must "deactivate that safety bar first, and then you can pull the trigger back to fire the gun." In response to a member's question, the expert testified he had "never seen a negligent or accidental discharge of a Glock, whether it was . . . fired in range or during competitions or in literature, where the trigger wasn't pulled." Another expert in firearms examination testified that this particular firearm required just over six pounds of pressure or weight to pull the trigger, which is within the standard range for a Glock; in contrast, the expert testified, a "hair trigger" requires less than two pounds.

Appellant's defense of accident was not well supported. Appellant's admissions that he "wasn't thinking like a gun owner" and "was so confident . . . [be]cause the gun wasn't firing at all that night" reasonably can be understood to describe culpable negligence. Appellant did not state where the gun was pointing before he grabbed it from MJ, except for once saying MJ threatened the dog with the gun. The evidence does not support a conclusion that MJ pointed the gun at himself. A reasonable conclusion from the evidence is that Appellant knew the gun was loaded with live ammunition, either took the gun from MJ or already possessed it, maneuvered it so that Appellant's finger was on the trigger and it was pointing towards the top of MJ's head, and then applied over six pounds of pressure to fire the weapon and shoot MJ. That the weapon actually fired may have been a surprise to Appellant because it had been misfiring, but his actions immediately leading to the firing were more than simply negligent. Thus, the members reasonably could find the defense of accident did not exist.

Appellant would have us find that he was engaged in the lawful act of "taking back his own weapon back from MJ" in a lawful manner without any unlawful intent, thus meeting the three prongs of the defense of accident. *See Arnold*, 40 M.J. at 745–46 (citing *United States v. Van Syoc*, 36 M.J. 461, 464 (C.M.A. 1993)). We are unconvinced that "grabbing" a loaded firearm under these circumstances was not negligent. Moreover, while one could conclude from the evidence that the act of "grabbing" was among the acts that may have caused the gun to fire as Appellant suggests, it does not negate other conclusions—including that Appellant turned the handgun toward MJ and pulled the trigger. We find the Prosecution disproved the defense of accident beyond a reasonable doubt despite the possibility that MJ's death was a consequence of Appellant retrieving his gun from MJ.

Appellant also implies that MJ could be to blame for his death. On appeal, Appellant states: "From the limited evidence, it is impossible to know what MJ may have done while [Appellant] grabbed the gun." Such mere speculation does not give rise to a superseding cause of death. The members found the proximate cause was Appellant shooting MJ as a result of a culpably negligent act

of Appellant. Appellant's statements after the shooting belie Appellant's claims that MJ was the cause of his injuries and resultant death.

In assessing legal sufficiency, we are limited to the evidence produced at trial and are required to consider it in the light most favorable to the Prosecution. We conclude that a rational factfinder could have found beyond a reasonable doubt all the essential elements of Appellant's convicted offense of involuntary manslaughter. Furthermore, in assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction on the Specification of Charge II for involuntary manslaughter legally and factually sufficient.

## B. Communicating a Threat – Legal and Factual Sufficiency

### 1. Additional Background

In July 2017, Appellant lived with his two roommates AB and BI. AB had worked with AFOSI as a confidential informant. On 23 July 2017, AB came home around 0330, after a long night of designated driving for friends who were drinking alcohol. She joined Appellant and his civilian friend MS in the backyard. Shortly thereafter, both Appellant and MS snorted cocaine. AB rejected their offer to take some, then went to bed around 0400. BI had been asleep during this time and woke up around 0630. BI found Appellant was awake; it appeared to BI that Appellant had been up all night drinking and using cocaine. Appellant and BI spent the rest of the day drinking.

After AB woke up around 1800 hours, BI, who was very upset, asked her to drive him to an "AA meeting." Appellant declined to join them. During the meeting, Appellant called BI, who was crying and did not answer the phone. Appellant then started sending text messages to AB. The messages included: "Whoever the sick sadistic mf who did this I'm going to kill," and "Tell me who did it and I'll go easy on you." Appellant also asked, "Who in the f[**]k went into my room and took my s[**]t [a]nd tied me with it[?] I'm f[**]king dead as serious[,] who did it or who did you hit up[?]"

When AB and BI arrived home from the AA meeting, the front door was locked and AB did not have a key. They walked to the side of the house and saw Appellant sitting in a lawn chair, with a handgun and extended clip on a barstool next to him. Some sort of flat twine was strewn around the yard, but they did not see indications that Appellant had been tied up. Neither knew why Appellant believed he had been "hogtied." BI thought Appellant "looked confused, maybe irrational" and "scared," and AB thought Appellant was drunk and "coming down from a cocaine high." Appellant offered AB "one more chance" to tell him who was sent to the house. AB saw Appellant rotate the

gun so it pointed at her; BI did not see Appellant touch the gun. BI took Appellant's gun and put it on top of the refrigerator. AB later took the clip and hid it. AB texted an AFOSI agent about what happened, and later came to believe that AFOSI agents had seized the gun. AB moved out about a month later. Appellant was found guilty of communicating a threat to AB, but not guilty of aggravated assault for his conduct involving the handgun.

**2. Law**

The elements of communicating a threat, as alleged in the Specification of Charge IV, include that: (1) Appellant communicated certain language expressing a present determination or intent to wrongfully injure AB presently or in the future; (2) the communication was made known to AB; (3) the communication was wrongful; and (4) under the circumstances, Appellant's conduct was to the prejudice of good order and discipline in the armed forces. *See* 2016 *MCM*, pt. IV, ¶ 110.b.

We evaluate the first element—whether the communication constituted a threat—from the point of view of a reasonable person. *United States v. Rapert*, 75 M.J. 164, 168 (C.A.A.F. 2016). "Importantly, however, this objective approach to the notion of a 'threat' refers only to the *first* element of the offense and not to the *third* element." *Id.* (emphasis in original). That is, while the language used must convey a present determination or intent, an accused need not actually intend to do the injury threatened. 2016 *MCM*, pt. IV, ¶ 110.c. Moreover, a communication is wrongful when an accused transmitted it "for the purpose of issuing a threat, with the knowledge that the communication would be viewed as a threat, or acted recklessly with regard to whether the communication would be viewed as a threat." *Id.*

**3. Analysis**

Appellant's basis for attacking the legal sufficiency of his conviction of communicating a threat is that the alleged language was not a threat to injure AB, was not wrongful, or both.

Appellant was charged with wrongfully communicating a threat to injure AB by making two statements: (1) "Whoever the sick sadistic mf who did this I'm going to kill," and (2) "Tell me who did it and I'll go easy on you." As he did at trial, Appellant claims the first statement does not communicate a threat to injure AB because Appellant did not know who tied him up. Appellant claims the second statement would not be perceived by a reasonable person as a threat, but instead just a drunk and drugged Appellant annoying his roommate with "idle banter."

The Government asserts the messages together demonstrate Appellant was angry, and he directed his anger at AB because he thought she was personally responsible for tying him up, or at least knew who was. Indeed, the

evidence showed the two statements were related; they were in the string of text messages Appellant sent to AB after he believed someone tied him up.

We need not interpret the statements separately. Appellant was charged with communicating "a threat to injure" AB, and both statements comprise the charged threat. A reasonable reading of the text messages, as well as the context before, during, and after Appellant sent them, is that Appellant was going to kill those who tied him up; that he demanded AB provide him information about who besides her was involved in tying him up; and that AB providing him that information would result in her injury being less severe than death.

Finally, we are not persuaded by Appellant's argument that his threatening communication was not wrongful. Not only did Appellant's text messages indicate he was very angry, but he said he was "dead as serious." Moreover, the fact that Appellant soon thereafter confronted AB with a gun provides some evidence that he meant his words to be perceived as a threat. The evidence does not lead to a conclusion that the statements were only "idle banter."

In assessing legal sufficiency, we are limited to the evidence produced at trial and are required to consider it in the light most favorable to the Prosecution. *See Robinson*, 77 M.J. at 297–98 (citation omitted). We conclude that a rational factfinder could have found beyond a reasonable doubt all the essential elements of Appellant's convicted offense. Furthermore, in assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, *see Turner*, 25 M.J. at 325, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction for communicating a threat as alleged in the Specification of Charge IV legally and factually sufficient.

## C. Discovery/Prosecutorial Misconduct

### 1. Additional Background

Sometime between when the court recessed for the evening on 26 June 2019—in the middle of the Government's findings case in chief—and when it opened again the next morning, the military judge was informed of a potential conflict involving Capt AH, the assistant trial counsel, and SA GM, an AFOSI agent formerly assigned to Cannon AFB. The allegation was that Capt AH and SA GM engaged in a sexual relationship during 2017 and 2018 while both were married to other people. The military judge gave counsel most of the day "to explore the issue and the potential impact it may have on this case." By the end of the day, the staff judge advocate removed Capt AH from the case and the Defense indicated it would file a written motion to dismiss with prejudice

based on Fifth Amendment and *Brady* violations.[14] The Defense told the military judge: "the only remedy we will be requesting is dismissal with prejudice. We would oppose dismissal without prejudice, and we would oppose a mistrial." In anticipation of filing its written motion that evening, the Defense was allowed to call its two witnesses—SA CO and SA AD—and present argument. The Defense filed its written motion to dismiss on 27 June 2019 and the Government filed its opposition thereafter.

The afternoon of the next day, 28 June 2019, the parties marked their written filings and the military judge provided an oral ruling. The military judge issued a written ruling the same day; he denied the Defense's motion to dismiss with prejudice.

We find the military judge's findings of fact regarding this motion to be supported by the record and not clearly erroneous. SA GM was an enlisted AFOSI agent assigned to Cannon AFB during the AFOSI investigation of Appellant. In July 2017, he and another AFOSI agent (SA AD) interviewed AB about Appellant pointing a firearm at her and communicating a threat to her. AB believed that firearm was seized by AFOSI agents; however, no AFOSI agent, including SA GM, admitted to seizing it. Also in July 2017, AB witnessed Appellant use cocaine, and notified SA AD. Later, Appellant worked for AFOSI as a confidential informant, during which time SA GM interacted with him on one operation.

Capt AH arrived to Cannon AFB in August 2017. The next month, she interviewed AB about the assault and threat. The record does not indicate when Capt AH was detailed as assistant trial counsel in Appellant's general court-martial, but does show she acted in that role as early as November 2018, while the murder investigation was ongoing.

Four AFOSI agents heard that SA GM claimed to have had an affair with Capt AH. SA CO and SA AD—the two agents who testified during motions practice that SA GM told them this directly—doubted his veracity. One of those agents, SA CO, heard this claim in June 2018, but did not report it to his leadership until sometime between November 2018 and January 2019, after SA GM had left Cannon AFB.[15]

In response to the shooting in July 2018, SA GM and two other agents were called out to Appellant's home. SA CO was the lead AFOSI agent in the murder investigation. SA GM was not assigned to work on the murder investigation

---

[14] U.S. CONST. amend. V; *Brady v. Maryland*, 373 U.S. 83 (1963).

[15] The record indicates SA GM deployed or permanently changed duty stations.

and had no role in the case. SA CO testified that any unprofessional relationship between SA GM and Capt AH would have had no effect on how AFOSI handled the investigation.

Shortly before trial, on 20 May 2019 the Defense notified the Government that SA GM was on its witness list. Because SA GM was deployed, Capt AH asked the Defense if it was amenable to stipulations of fact as an alternate to production of SA GM. One stipulation Capt AH proposed was that the firearm was not seized by AFOSI agents, to include SA GM and SA WB, in July 2017.

About a week before the trial began, Capt AH had an email exchange with SA GM, who wanted to know what he needed to do to prepare for trial. In her message dated 20 June 2019, she told SA GM that the Defense might ask him about his "memory of seizing/non-seizing [Appellant]'s firearm" in July 2017. SA GM maintained he had no memory of seizing the firearm, stating: "I do not remember taking any guns. I remember an op[eration][16] with [Appellant], but taking a gun is something I really think I would remember doing if I did it." The Government did not provide this email to the Defense until trial.

### 2. Law

In reviewing discovery matters, we conduct a two-step analysis: "first, we determine whether the information or evidence at issue was subject to disclosure or discovery; second, if there was nondisclosure of such information, we test the effect of that nondisclosure on the appellant's trial." *United States v. Coleman*, 72 M.J. 184, 187 (C.A.A.F. 2013) (quoting *United States v. Roberts*, 59 M.J. 323, 325 (C.A.A.F. 2004)).

"The failure of the trial counsel to disclose evidence that is favorable to the defense on the issue of guilt or sentencing violates an accused's constitutional right to due process." *Coleman*, 72 M.J. at 186 (citing *Brady*, 373 U.S. at 87). Such cases are reviewed for harmless error. *Id*. (citing *Smith v. Cain*, 565 U.S. 73, 75 (2012)). Favorable evidence includes "impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citation omitted); *see also United States v. Claxton*, 76 M.J. 356, 359 (C.A.A.F. 2017) (quoting *Strickler*, 527 U.S. at 280).

> There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must

---

[16] This is a reference to a controlled buy of illegal drugs while Appellant was acting with the AFOSI as a confidential informant—after Appellant admitted to AFOSI that he had used illegal drugs.

> have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler*, 527 U.S. at 281–82.

Prejudice is shown when the undisclosed evidence is material, and "[s]uch evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler*, 527 U.S. at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also Smith*, 565 U.S. at 75 (citation omitted). A reasonable "possibility" of a different result is not sufficient. *Strickler*, 527 U.S. at 291. We evaluate prejudice from the nondisclosure "in the context of the entire record." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)); *see also United States v. Stone*, 40 M.J, 420, 423 (C.M.A. 1994) (noting that "recourse to *the entire record* of trial is required to determine the effect of the undisclosed evidence on the conviction"). We evaluate the military judge's determination of materiality de novo. *See Roberts*, 59 M.J. at 326 (citing *United States v. Morris*, 52 M.J. 193, 198 (C.A.A.F. 1999)).

A *Brady* violation is demonstrated "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). Whether the military judge would have allowed the evidence to be admitted is not determinative: "In this context however, the question is not whether the military judge would or would not have permitted the cross-examination under [Mil. R. Evid.] 608(b), but whether the information was material to the defense's preparation for trial." *Roberts*, 59 M.J. at 326 (citing R.C.M. 701(a)(2)(A)).

"A military accused also has the right to obtain favorable evidence under Article 46, UCMJ, 10 U.S.C. § 846 (2006), as implemented by R.C.M. 701–703." *Coleman*, 72 M.J. at 186–87 (footnotes omitted). The United States Court of Appeals for the Armed Forces (CAAF) "has held that Article 46[, UCMJ,] and its implementing rules provide greater statutory discovery rights to an accused than does his constitutional right to due process." *Coleman*, 72 M.J. at 186 (citing *Roberts*, 59 M.J. at 327). Thus, when "the defense made a specific request for the undisclosed information . . . we apply the heightened constitutional harmless beyond a reasonable doubt standard." *Coleman*, 72 M.J. at 187 (citations omitted).

When fashioning a remedy for a discovery violation, military judges consider the individual facts of the case. *See United States v. Dancy*, 38 M.J. 1, 6 (C.M.A. 1993). Remedies can include granting a continuance, prohibiting a party from calling a witness or introducing evidence, dismissal with or without

prejudice, or providing a remedy that is considered just under the circumstances. *See United States v. Stellato*, 74 M.J. 473, 488 (C.A.A.F. 2015); R.C.M. 701(g)(3). Dismissal "is a drastic remedy" but nevertheless may be appropriate when "no lesser sanction will remedy" the prejudicial effects of the discovery violation. *Stellato*, 74 M.J. at 488 (internal quotation marks and citation omitted). We evaluate the military judge's choice of remedy for an abuse of discretion. *Id.* at 480.

**3. Analysis**

In his oral ruling, the military judge considered the Government's failure to provide to the Defense the email exchange between SA GM and Capt AH as well as failure to disclose the nature of their relationship. The military judge found no *Brady* violation related to the email; the Government had already notified the Defense that no agent maintained they had seized Appellant's firearm in 2017. Regarding the relationship, the military judge first found that Capt AH's removal as assistant trial counsel was a sufficient remedy for any prosecutorial misconduct. He then found no *Brady* violation related to failure to disclose this relationship to the Defense. He analyzed both discovery issues using the factors in *Strickler*.

Appellant asserts the military judge abused his discretion by denying the defense motion to dismiss, and challenges the failure to disclose the nature of the relationship but not the failure to disclose the email. Appellant does not dispute the military judge's understanding of *Brady* and *Strickler*, but claims the military judge's conclusions regarding the first (favorable to the Defense) and third (prejudice) *Strickler* prongs were erroneous. *See Strickler*, 527 U.S. at 281–82. The Government does not contest that the alleged relationship was subject to discovery, but asserts the military judge's findings, analysis, and conclusions were not erroneous.

We agree with Appellant that the military judge erred in his analysis of whether information about the alleged relationship was favorable to the Defense. However, we find that the military judge did not err in his conclusions that Appellant was not prejudiced by the nondisclosure and that dismissal with prejudice was not warranted.

**a. Favorable Evidence**

Addressing whether the information would be favorable to the Defense, the military judge found it "speculative at best." He continued:

> Having played no meaningful role in either investigation, there is no evidence that the existence of a relationship between SA [GM] and Capt [AH], had it been disclosed, would have amounted to evidence that was favorable to the Defense. . . . While it could conceivably be perceived as a design on the part

> of his fellow agents to protect SA [GM], given his insignificant role in this particular case, any impeachment would be on a collateral matter having little if any probative value, and would fail to survive the [Mil. R. Evid.] 403 balancing test.

To the extent the military judge was addressing the *admissibility* of the evidence to determine if it was favorable to the Appellant under the first *Strickler* prong, we find error. When considering whether evidence is favorable, we look not to whether it would be admitted, but whether the information had exculpatory or impeachment value. *See Roberts*, 59 M.J. at 326. Thus a military judge's determination that evidence would be excluded under Mil. R. Evid. 403 is of little consequence in determining whether the evidence would be favorable to the Defense and subject to disclosure. The question is whether the information at issue—that assistant trial counsel allegedly had an unprofessional relationship with an AFOSI agent who had a tangential role in the investigation of Appellant's offenses—was subject to disclosure because it had exculpatory or impeachment value, and thus was favorable to defense preparation. In this case, we see some impeachment value in any such evidence, and disclosure to the Defense could have helped it prepare for trial. The military judge's analysis of whether the information would be favorable to the Defense is better suited to whether Appellant suffered prejudice.

### b. Prejudice and Materiality

In his prejudice analysis, the military judge found:

> There must be some logical tie between the relationship and either actions taken as part of the investigation or conduct that would amount to valid impeachment evidence for the relationship to be material to the case and result in an unfair trial, thereby prejudicing the Accused. No such link has been established.

The military judge emphasized the facts that Capt AH was not involved in the investigation of Appellant's drug offenses, and that SA GM was not involved in the investigation of Appellant's homicide offense. He also concluded that whether AFOSI seized Appellant's firearm in 2017 was irrelevant to the offenses with which Appellant was charged. Specifically, he found that "whether or not [AB] felt safe or unsafe due to her understanding of whether the gun was seized is irrelevant," "the controlled buy took place *after* the alleged assault," and "any effort to cross examine agents and suggest that their failure to seize a firearm in August 2017 . . . somehow contributed to the shooting of [MJ] would not be probative of any fact in issue and would surely fail the [Mil. R. Evid.] 403 balancing test."

After finding the third *Strickler* prong was not met, the military judge addressed trial defense counsel's arguments that the Defense would have approached this case differently had the claim of an inappropriate relationship been disclosed. He found this argument unsupported by the evidence. As to the drug offenses to which Appellant pleaded guilty, the military judge noted the Government's evidence was strong, and included Appellant's confession; "Capt [AH] did not even arrive on station until after the drug investigation was complete;" and the emails regarding whether the firearm was seized were "entirely professional in nature and consistent with the type of communications" between trial counsel and potential witnesses. As to the offenses involving AB, she was "the primary witness . . . with [AF]OSI primarily taking statements." And finally, "the vast majority of the physical evidence related to the alleged murder was collected by Clovis [Police Department]." He summarized his conclusion: "The Court fails to see how knowledge of the existence of the relationship in question would have driven significant changes to the Defense approach to the [AF]OSI investigation to a degree warranting dismissal with prejudice."

On appeal, Appellant outlines "evidence of the investigators' questionable behavior that could aid the Defense in demonstrating reasonable doubt." Specifically, Appellant notes:

> (1) [AF]OSI inexplicably failed to seize the weapon that was allegedly used to assault their [confidential informant]; (2) the detachment commander, who was later relieved, ordered SA CO to make a year-old entry in the [internal data pages] indicating a weapon was seized that was never in fact seized; (3) SA AC lacked an understanding of some basics of crime scene analysis; (4) SA AC made an inappropriate Facebook Live video during the investigation itself, in part to complain about the [Clovis Police Department]; (5) at least five agents and investigators were aware of an unprofessional relationship between trial counsel and an agent, yet this information never left the detachment; and (6) the detachment's failure to swab the Glock for fingerprints to see if MJ handled the weapon. Taken together, the Defense could have mounted a comprehensive attack of the detachment's competence, or decided not to plead guilty to some specifications.

Appellant continues: "It lost these options because of Capt AH's *Brady* violation. This is prejudice. The military judge abused his discretion in finding otherwise."

We disagree that Appellant lost these options for attacking the AFOSI investigation and the credibility of the agents. Before the alleged discovery violation, the record shows the Defense had information about five of the six "questionable behaviors" by AFOSI—all but the alleged unprofessional relationship. Not only did it have this other information, the Defense actually presented much of it at trial. It "lost" only an opportunity to try to get information about the alleged relationship—and the AFOSI agents' beliefs about its existence—before the members, and an opportunity to try to impeach SA GM.

We agree with the military judge that such evidence would fail a Mil. R. Evid. 403 balancing test. At the time of trial, the matter had not been investigated. This was a highly inflammatory claim about the personal and sexual relationships of two people involved in Appellant's court-martial, one of whom had very little involvement in the investigations against Appellant. We find very little probative value and a high danger of prejudice and confusion of the issues. Thus, even if the allegation had been disclosed to the Defense, the details of it would not have been before the fact-finder. Accordingly, Appellant has not established prejudice and has thus failed to establish a *Brady* violation. *See Strickler*, 527 U.S. at 281–82.

### c. Harmless Beyond a Reasonable Doubt

Finding no *Brady* violation, we consider whether relief is warranted for failure to provide discovery under Article 46, UCMJ. If the Defense made "a specific request for the undisclosed information . . . we apply the heightened constitutional harmless beyond a reasonable doubt standard" in assessing the failure to disclose. *Coleman*, 72 M.J. at 187 (citations omitted). On appeal, both parties presume that Appellant's discovery request for the undisclosed information was specific and not general.[17] We will accept that presumption, as our determination is the same.

We are convinced that the failure of the Government to disclose to the Defense the claim that SA GM and Capt AH had an unprofessional relationship is harmless beyond a reasonable doubt. A replacement assistant trial counsel might have been detailed to prosecute the case, but the strength and admissibility of the evidence—and the strategic decisions based thereon—would not

---

[17] At trial and on appeal, Appellant did not assert he made a specific request for information regarding the personal relationships of potential witnesses. Instead, Appellant made a more generic request for evidence tending "to diminish the credibility of any witness, potential witness, alleged victims, or co-actor, including evidence of character, conduct, or bias." The specific examples of the information requested were convictions, military discharges, nonjudicial punishment, and adverse administrative actions. The Defense cited *Brady* and *Giglio v. United States*, 405 U.S. 150 (1972). Capt AH provided the Government's discovery response.

have changed. We note that even after Appellant learned about SA GM's claim, he did not want a continuance or a mistrial, which would result in a delay and time for investigation into the claim. We see no reasonable probability that, had the information been disclosed to the Defense, the result of Appellant's court-martial would have been different. Any belief that the result would have been different is speculative and is unsupported by the record.

### d. Remedy

The law provides the military judge wide discretion to fashion an appropriate remedy for a discovery violation based on the facts of the case. At trial, Appellant narrowed those options, insisting the only remedy he sought was dismissal with prejudice. The military judge considered that option, and concluded dismissal with prejudice was not warranted. He noted that one remedy was already in place: Capt AH was removed as assistant trial counsel. He restated his previous findings: "It is speculative at best whether or not the relationship in any way actually impacted the investigation, the prosecution, or otherwise deprived the Defense of impeachment material or other information favorable to the Defense that has resulted in an unfair trial." Finally, he noted the members were unaware of the issue and accordingly concluded that no curative instruction was required.

Any prejudice Appellant may have suffered as a result of not knowing about the claimed relationship does not warrant the remedy of dismissal with prejudice. Less drastic measures were available, including a delay to prepare cross-examination, withdrawal of Appellant's guilty pleas, or a mistrial. *See Stellato*, 74 M.J. at 488. However, the Defense made clear that it was only requesting dismissal with prejudice, to the exclusion of all other remedies. We find the military judge did not abuse his discretion by denying Appellant the particular relief he requested.

### e. Prosecutorial Misconduct

Appellant claims the failure of assistant trial counsel to disclose to the Defense the nature of her relationship with SA GM is prosecutorial misconduct: "Here, the gatekeeper of discovery from the Government to the Defense is the very person implicated in the discovery owed to the Defense, and the decision is made by that individual to conceal, rather than disclose." Appellant claims this court should "recognize that prosecutorial misconduct of this gravity rises to the level of a due process violation" and asks us to set aside the findings and sentence with prejudice. Appellant acknowledges that the trial defense counsel did not "explicitly invoke the language of prosecutorial misconduct," but claims that was "the inescapable implication of its attack on Capt AH's conduct."

Appellant asserts Capt AH should have disqualified herself, or at least disclosed grounds for disqualification, and that her "failure to raise the issue of

her disqualification was misconduct, plain and simple." Appellant's claims of prosecutorial misconduct against Capt AH all presume SA GM's claim is true. We have considered whether a post-trial evidentiary hearing is required to resolve the factual issue of whether there was, in fact, an unprofessional relationship. *See United States v. Parker*, 36 M.J. 269, 272 (C.M.A. 1993) (noting the purpose of such a hearing "is merely to clarify collateral or predicate matters"); *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967). We find a hearing unnecessary to resolve Appellant's claims. Even assuming the existence of an unprofessional relationship, we find no further remedy is warranted in this case—especially not Appellant's requested remedy of setting aside all charges and specifications.

## D. Format of Victim Impact Unsworn Statement

Appellant contends that the military judge abused his discretion in allowing two victims to present unsworn statements via a question-and-answer format with trial counsel. We disagree.

### 1. Additional Background

MJ was survived by his parents and brother. Upon an unopposed Government request, the military judge appointed MJ's mother, MH, as MJ's legal representative "for purposes of assuming her [sic] rights" pursuant to Article 6b, UCMJ, 10 U.S.C. § 806b.

In an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing in pre-sentencing, the military judge summarized a conference he had with counsel pursuant to R.C.M. 802. The parties had informed the military judge that both Appellant and victims desired to use a question-and-answer format from the witness stand.

During the Article 39(a), UCMJ, hearing, the circuit defense counsel objected to both the question-and-answer format and the lack of a written proffer of the statements from the victims:

> MJ: Okay. And what's the objection to the Q&A?
>
> CDC: Your Honor, [R.C.M.] 1001(c)(5) is kind of very specific in terms of how the unsworns can be done and it says there needs to be a written proffer of what they're going to be talking about and we think that essentially what is being done is the exact opposite of what the rule specifically says must be done.
>
> MJ: Okay. So, Government, in reviewing [R.C.M.] 1001(c) sort of in its entirety, it doesn't necessarily preclude a Q&A format but it also doesn't imply a Q&A format in the same way that we've seen with the unsworn statement of the accused but one thing it does require -- oh, by the way, there is a reference to the military

34

judge's ability to reasonably limit the form and statements provided and that cites back to RCM 801(a)(3),[18] which states subject to the Uniform Code of Military Justice and this [M]anual, the military judge exercises reasonable control over the proceedings to promote the purposes of these rules and the manual. So, I do have some discretion. However, there is a requirement that a written proffer at least be provided to the [D]efense.

The circuit trial counsel addressed the Defense's objection to the question-and-answer format:

The rule does not prohibit it. We think it's permissible. This is a unique case. [Appellant] was just convicted of killing these people's son so I think it would be appropriate for them to sit and answer questions. It also gives us, as the trial counsel, the ability to appease some of the defense concerns that this could go off the rails or outside the bounds[. I]f we do it in a question and answer format, we have the ability to control that versus just letting the mother, father, and brother get up and talk, which does -- there are concerns from trial counsel in any case but certainly in a case like this that it could go outside the bounds, and we want the ability to control that and we think that the best way to do that would be through a question and answer format.

The military judge then ruled:

So, within my authority under [R.C.M.] 801(a)(3) and after reviewing [R.C.M.] 1001(c), I don't see any language in here that would specifically prohibit a Q&A style unsworn victim impact statement, provided that the [G]overnment does comply with the rule with regard to providing a written proffer of the matters that are going to be addressed in the statement. And, so, as long as that satisfies the [D]efense is prepared to object to anything that they may find in that statement, and I do tend to agree with the [G]overnment in a sense that it does give counsel greater control of the matters that are revealed during the unsworn statement if they are controlling the questioning and the answering. But either way, the court has a sua sponte duty to step in and intervene if a victim impact statement strays beyond the

---

[18] "The military judge shall: . . . [s]ubject to the UCMJ and this Manual, exercise reasonable control over the proceedings to promote the purposes of these rules and this Manual." R.C.M. 801(a)(3).

confines of [R.C.M.] 1001, and the court will exercise that authority. So, it's just a matter of providing them that written contact. I'm indifferent as to whether or not the individuals want to submit to an actual interview but what I don't want to do is excessively delay the morning while the interview's being conducted.

When the Defense renewed its objection, the military judge reiterated his ruling:

Again, I find that's within my authority under [R.C.M.] 801(a)(3) to allow for the format of how evidence is presented and how unsworn statements are presented in this court-martial. I don't believe that a Q&A format, in any way, runs contrary to [R.C.M.] 1001(c). In fact, I think, again, as the government articulated, it provides a greater sense of control in the sense that the government can control the questions, raise and reorient the witness - - the individual providing the unsworn statement. And so, I understand your objection but it's overruled. I think that's well within the confines of the rule to allow that Q&A format.

The Government anticipated MJ's mother, father, and brother would make unsworn statements. None were represented by counsel. Only the brother's statement was in writing.[19] In discussion with the military judge regarding the Defense's objection, the circuit trial counsel said she told the family they would have to subject themselves to an interview with the Defense if they chose not to write out a proffer of their oral statements. On a break, the Government provided the Defense a "proffered statement" and the Defense "had the opportunity to talk to [members of] the family."[20]

The Defense also objected to the parents' statements addressing pre-incident topics, including MJ's "childhood, the things he enjoyed doing, why he wanted to come into the Air Force, how proud they were of him when he joined the Air Force, just a lot of biographical data on him growing up, which is totally unrelated to victim impact." The Government countered that those topics are

---

[19] This statement was marked and presented to the members as a court exhibit. MJ's brother did not provide an oral statement.

[20] The record is not clear whether the mother and father provided a written proffer, or the Government prepared a written proffer on the family's behalf, or if this refers to the brother's written statement. It also is not clear who "the family" comprised. Finally, the Government and the military judge may have presumed the Government was responsible for providing the Defense a proffer of the victims' statements.

relevant "to understand who [MJ] is and why this has had such an impact on them." The military judge ruled:

> Based on the proffered expected unsworn statement as articulated by the [G]overnment and after consideration of the [D]efense's concerns, I'm going to overrule that objection. [R.C.M.] 1001(c)(2)(B) describes victim impact as any financial, social, psychological and medical impact on the crime victim directly relating to or arising from the offense of which the accused has been found guilty. Given that this case involves an offense that resulted in the death of another human being, the ability for the family to articulate that individual's life up to the point where he died, I think is relevant, within the definition of victim impact, certainly at a minimum the psychological impact on the family of having a loved one deceased.

After the Government rested its case in presentencing, the military judge provided the court members an instruction regarding victim unsworn statements:

> Members of the Court, at this time you will hear some unsworn statements from individuals that are identified as victims of the crime. I want to read you a brief instruction though as to how you can consider these particular statements. An unsworn statement is an authorized means for [a] victim to bring information to the attention of the court and must be given appropriate consideration. The victim cannot be cross-examined by the [P]rosecution or [D]efense or interrogated by court members, or me, upon an unsworn statement but the parties may offer evidence to rebut statements of fact contained in it. The weight and significance to be attached to an unsworn statement rests within the sound discretion of each court member. You may consider that the statement is not under oath, its inherent probability or improbability, whether it is supported or contradicted by evidence in the case, as well as any other matter that may have a bearing upon its credibility. In weighing an unsworn statement, you are expected to use your common sense and your knowledge of human nature and the ways of the world.

The first victim to provide an oral unsworn statement was MH, MJ's mother and Article 6b, UCMJ, representative. The assistant trial counsel asked her questions, including: her name and her relationship to MJ, where MJ was born, his hometown, his personality as a baby, what he was like as an older child and in high school, how MJ felt being stationed so close to home, why MJ joined the Air Force, and how it felt to watch him graduate from basic

training. Additionally, counsel asked MH questions relating to MJ's injury and death, including how she learned about it, how she felt at the hospital where MJ was being treated, how her life has been affected without MJ, and what had been done to memorialize MJ. Many of MH's responses were narrative or provided more information than called for in the question.

The second victim to provide an oral unsworn statement was MJ's father. The circuit trial counsel asked him questions, including: background of MJ's birth and name, what MJ was like as a young child and older child, the father's relationship with MJ and MJ's brother, what he thought of MJ joining the Air Force and being stationed close to home, how it felt to watch MJ graduate from basic training, and whether MJ enjoyed being in the Air Force. Additionally, counsel asked him questions relating to MJ's injury and death, including how the father learned about it, going to the hospital where MJ was being treated, how he thought about MJ now that MJ was deceased, and changes in the family dynamic (which answer was mostly non-responsive). Like MH, many of MJ's father's responses were narrative or provided more information than called for in the question. Some of the questions were more directive in nature, including whether he was proud of MJ when he joined the Air Force and whether they immediately drove to Lubbock after learning MJ was shot. After the circuit trial counsel had no more questions, the military judge thanked MJ's father for his "testimony;" at the same point after MH's statement, the military judge told MH she was "good to step down."

### 2. Law

We review a military judge's interpretation of R.C.M. 1001[21] de novo, but review a decision to admit victim-impact statements in pre-sentencing for an abuse of discretion. *See United States v. Hamilton*, 78 M.J. 335, 340 (C.A.A.F. 2019); *United States v. Barker*, 77 M.J. 377, 382–383 (C.A.A.F. 2018); *see also United States v. Tyler*, 81 M.J. 108, 112–113 (C.A.A.F. 2021) (describing the military judge as the "gatekeeper for unsworn victim statements" with the power to restrict their contents.). A military judge abuses his discretion when he makes a ruling based on an erroneous view of the law. *See Barker*, 77 M.J. at 383 (citing *United States v. Lubich*, 72 M.J. 170, 173 (C.A.A.F. 2015)).

Article 6b, UCMJ, details several rights belonging to crime victims. Among them are the "right to be reasonably heard at . . . a sentencing hearing relating to the offense," and the "reasonable right to confer with the counsel represent-

---

[21] Rules addressing a victim's right to be reasonably heard were contained in R.C.M. 1001A (2016 *MCM*). However, those rules are now contained in R.C.M. 1001(c). *See* 2019 *MCM*, App. 15, at A15-18 ("R.C.M. 1001(c) is new and incorporates R.C.M. 1001A of the MCM (2016 edition)."). Our analysis cites to these versions as applicable.

ing the Government" at a court-martial proceeding relating to the offense. Articles 6b(a)(4)(B) and 6b(a)(5), UCMJ, 10 U.S.C. §§ 806b(a)(4)(B), (a)(5). *See also* R.C.M. 1001(c)(1) ("[A] crime victim of an offense of which the accused has been found guilty has the right to be reasonably heard at the presentencing proceeding relating to that offense.").

In presentencing, "[t]he crime victim may make an unsworn statement and may not be cross-examined by trial counsel or defense counsel, or examined upon it by the court-martial." R.C.M. 1001(c)(5)(A). A victim's right to be reasonably heard, which can include making an unsworn statement, is separate from the parties' rights to present evidence. The CAAF has specifically noted that the R.C.M. 1001A/1001(c) process "belongs to the victim" who has "an independent right to be reasonably heard at a sentencing hearing." *Barker*, 77 M.J. at 383 (internal quotation marks and citations omitted). "Upon good cause shown, the military judge may permit the crime victim's counsel, if any, to deliver all or part of the crime victim's unsworn statement." R.C.M. 1001(c)(5)(B).

"We conclude that the rights vindicated by R.C.M. 1001A are personal to the victim in each individual case. Therefore, the introduction of statements under this rule is prohibited without, at a minimum, *either the presence or request of the victim*, the special victim's counsel, or the victim's representative." *Barker*, 77 M.J. at 382 (emphasis added) (citing R.C.M. 1001A(a) and R.C.M. 1001A(d)–(e)). "[T]he right to be reasonably heard requires that the victims be contacted, given the choice to participate in a particular case, and, if they choose to make a statement, offer the statement themselves, through counsel, or through a 'victim's designee' where appropriate." *Hamilton*, 78 M.J. at 339–40 (citations omitted).

"The military judge shall: . . . [a]t the military judge's discretion, in the case of a victim of an offense under the UCMJ who is . . . deceased, designate the legal guardian(s) of the victim or the representative(s) of the victim's estate, family members, or any other person deemed as suitable by the military judge to assume the victim's rights under the UCMJ." R.C.M. 801(a)(6); *see also* Article 6b(c), UCMJ, 10 U.S.C. § 806b(c).

### 3. Analysis

Appellant urges this court to find the question-and-answer format used in this case erroneous, and to set aside his sentence. He claims "[t]he military judge essentially allowed [MJ's parents] to testify from the witness stand without cross-examination." He rebukes the Government for having "commandeered [MJ's parents'] right of allocution," including exercising "control" over

the victims' statements.[22] We find the military judge did not err in determining that a question-and-answer format was a permissible means for the victims to present their unsworn statements to the sentencing authority under R.C.M. 1001(c). Moreover, we find it was not error for the victims to provide their statements as answers to trial counsel's questions, of which questions the Defense was on notice.

We acknowledge our sister court has come to a different conclusion on the latter issue. In *United States v. Cornelison*, 78 M.J. 739 (A. Ct. Crim. App. 2019), *rev. denied*, 79 M.J. 189 (C.A.A.F. 2019), the Army Court of Criminal Appeals (ACCA) considered whether it was error to allow an unsworn victim statement delivered in a question-and-answer format between the victim and trial counsel during the Government's presentencing case. The ACCA found no error in the question-and-answer format, but it found "R.C.M. 1001A(e)(2)[23] requires the victim's own counsel—not the trial counsel, defense counsel, or the court-martial—be the individual who asks the victim such questions." *Id.* at 744. The ACCA concluded "the military judge erred by failing to enforce R.C.M. 1001A as it is written when he allowed the trial counsel to participate in [the victim's] unsworn statement." *Cornelison*, 78 M.J. at 744. While the ACCA found error in the involvement of the trial counsel, as well as the timing of the statement, it found no prejudice. *Id.*; *see also United States v. Bailey*, No. ACM 39935, 2021 CCA LEXIS 380, at *15 (A.F. Ct. Crim. App. 30 Jul. 2021) (unpub. op.) (finding clear or obvious error when trial and trial defense counsel read victim statements out loud).

We do not conclude R.C.M. 1001(c) must be read narrowly, or even that a narrow interpretation would reach the same result as *Cornelison*. We do not interpret R.C.M. 1001(c) to require a result that seems inconsistent with the statutory right in Article 6b, UCMJ, to be "reasonably heard," which the President repeated in R.C.M. 1001(c)(1). The plain language of this right reaches both the substance of a victim's statement and the means by which the victim may be heard. The right countenances that a victim may choose to have members of the court and members of the public hear the victim in open court in the manner chosen by the victim, whether the victim makes an oral statement personally or through a question-and-answer format. We decline to find that a victim who chooses to participate by delivering an unsworn statement aided by

---

[22] We considered Appellant's additional assertion that the Government improperly argued the contents of the crime victims' unsworn statements, and find this claim has no merit. *See Tyler*, 81 M.J. at 113; *Matias*, 25 M.J. at 361.

[23] R.C.M. 1001A(e)(2) stated, "Upon good cause shown, the military judge may permit the victim's counsel to deliver all or part of the victim's unsworn statement." (2016 *MCM*).

counsel for either party is outside the scope of a victim's statutory and regulatory right to be reasonably heard.

We interpret R.C.M. 1001(c) to be in harmony with Article 6b, UCMJ. The language in R.C.M. 1001(c)(5)(B) stating "the military judge may permit the crime victim's counsel, if any, to deliver all or part of the crime victim's unsworn statement" could mean the President wanted to clearly identify a role for victims' counsel—who in the past have been excluded from participation in many facets of a court-martial—and not mean that victims could choose only those counsel to speak on their behalf. To conclude only the latter would diminish the rights Congress bestowed on victims. Moreover, we note both Congress and the President have stated a designated individual may assume the rights of the victim. Article 6b(c), UCMJ; R.C.M. 801(a)(6), 1001(c)(1). Interpreting R.C.M. 1001(c)(5)(B) *expressio unius est exclusio alterius* would mean only a crime victim's counsel may deliver the victim's unsworn statement. Such an interpretation necessarily excludes the designee—unless they also are the victim's counsel—from exercising the victim's right to be reasonably heard; we are confident neither Congress nor the President intended this result. Therefore, we find R.C.M. 1001(c)(5)(B), which allows for all or part of the victim's statement to be delivered by the victim's counsel, does not *prohibit* a victim from responding to open questions from a party's counsel, as occurred in this case. While R.C.M. 1001(c)(5)(A) prohibits cross-examination of a victim who provides an unsworn statement, it does not specifically prohibit direct questions to facilitate a victim's right to be reasonably heard.

Finally, we do not agree that trial counsel asking the victim open questions constitutes a "deliver[y of] all or part of the crime victim's unsworn statement." R.C.M. 1001(c)(5)(B). In this case, and in *Cornelison*, those questions provided context for the answers; the victim's answers, not the questions, constitute the victim's unsworn statement.

The victims in this case were active participants and personally delivered their unsworn statements to the court. This was not the situation in *Barker* and *Hamilton*, where the victims were not present at the presentencing hearing, their matters were introduced by trial counsel as prosecution exhibits, and there was no evidence the victims were even aware their statements were being admitted. Here, the victims requested that trial counsel direct their unsworn statements. *See Barker*, 77 M.J. at 382.

Even if trial counsel's questions should not have been made during the victim's unsworn statement, the questions were not an improper Government attempt to "slip in evidence in aggravation that that would otherwise be prohibited by the Military Rules of Evidence." *Hamilton*, 78 M.J. at 342. The military

41

judge had ruled,[24] over defense objection, that the proffered topics were within the scope of appropriate victim matters, and did not *sua sponte* interrupt either statement for going outside the scope.[25] We find the military judge did not abuse his discretion in allowing MJ's parents to present their unsworn statements to the court by answering questions posed by trial counsel.[26]

Even assuming error in trial counsel's facilitation of the crime victims' unsworn statements, we would find no prejudice. "If an error occurs in the admission of evidence at sentencing, the test for prejudice is whether the error substantially influenced the adjudged sentence." *Hamilton*, 78 M.J. at 343 (internal quotation marks and citation omitted). "When determining whether an error substantially influenced a sentence, this Court considers the following four factors: (1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *Id.* (internal quotation marks and citation omitted). "An error is more likely to be prejudicial if the fact was not already obvious from the other evidence presented at trial and would have provided new ammunition against an appellant." *Barker*, 77 M.J. at 384 (citation omitted). An error is more likely to be harmless when the evidence was not "critical on a pivotal issue in the case." *United States v. Cano*, 61 M.J. 74, 77–78 (C.A.A.F. 2005) (internal quotation marks and citation omitted).

To be clear, any error was in allowing the trial counsel's questions; the parents' answers were an appropriate exercise of their victim rights. We find trial counsel's questions had no substantial influence on the sentence. Those questions did not change the strength of the parties' cases, with the Government's case being significantly stronger than the Defense's case. The questions were

---

[24] Appellant does not challenge this ruling on appeal.

[25] Concern that the victims might state matters outside the proper scope of victim impact under R.C.M. 1001(c) was one of the Government's stated reasons in support of allowing the victims to answer questions vice requiring the victims to provide narrative statements, and one reason the military judge allowed it. We are hesitant to condemn the Government's attempt to prevent the members from hearing inappropriate matters.

[26] Notwithstanding a victim's right to be reasonably heard, a military judge has the responsibility to "[e]nsure that the dignity and decorum of the proceedings are maintained," and shall "exercise reasonable control over the proceedings." R.C.M. 801(a)(2)–(3); *LRM v. Kastenberg*, 72 M.J. 364, 372 (C.A.A.F. 2013) (noting that a victim's "right to a reasonable opportunity to be heard on factual and legal grounds" is "subject to reasonable limitations and the military judge retains appropriate discretion under R.C.M. 801").

within the scope of R.C.M. 1001(c) and, for the most part, were open ended. The Defense was on notice as to what topics each victim would address. We find Appellant was not prejudiced by the victims presenting unsworn statements in the form of responses to trial counsel's questions in this case.

**E. Sentencing Argument**

Appellant asserts error in the Government's sentencing argument relating to Appellant's record of nonjudicial punishment[27] as well as use of the word "reckless" to describe Appellant's behaviors. We find no error.

### 1. Additional Background

The Government offered into evidence in pre-sentencing several documents reflecting Appellant's history of misconduct. Among them were two referral enlisted performance reports, one referencing nonjudicial punishment and one referencing a failed drug screen; a record of nonjudicial punishment from July 2014, for drunk and disorderly conduct; a letter of counseling from February 2015, for failing to prepare for a uniform inspection; and a letter of reprimand (LOR) from February 2015, for failing a dorm inspection.

Additionally, the Government offered an LOR from August 2015, issued to Appellant for failing to report to duty on time. Appellant was to report for duty at 0700. After he was late, personnel from his unit went to his dorm; they did not find Appellant but they found his car in the dorm parking lot with an empty beer bottle next to it. At 0840, Appellant called his work section and explained that he was off base at the residence of BI, that they had been drinking, and that he had overslept. Appellant responded to the LOR in writing, concluding: "ADAPT[28] has taught me a great deal about the effects and repercussions of drinking alcohol. I will not let alcohol dictate my life or affect my career. Thank you."

The Defense objected to admission of the record of nonjudicial punishment and the LOR for failure to report for duty. The military judge allowed all the documents into evidence.

Before the court members heard argument from counsel, the military judge provided them comprehensive instructions, including:

> It is the duty of each member to vote for a proper sentence for the offenses of which the accused has been found guilty. Your determination of the kind and amount of punishment, if any, is

---

[27] *See* Article 15, UCMJ, 10 U.S.C. § 815, which authorizes nonjudicial punishment.

[28] We understand this to refer to the Air Force Alcohol and Drug Abuse Prevention and Treatment (ADAPT) program. *See generally* Air Force Instruction (AFI) 44-121, *Alcohol and Drug Abuse Prevention and Treatment (ADAPT) Program* (18 Jul. 2018).

a grave responsibility requiring the exercise of wise discretion. Although you must give due consideration to all matters in mitigation and extenuation, as well as to those in aggravation[, y]ou must bear in mind that the accused is to be sentenced only for the offenses of which he has been found guilty.

In sentencing argument, the circuit trial counsel made a connection from Appellant's nonjudicial punishment to the conduct of which he was convicted; trial defense counsel did not object.

If you were listening to that [guilty-plea] inquiry what he said was every time he was using those drugs, he was drinking. And he kept saying in different forms but the bottom line is he kept saying ["]my inhibitions were lowered. [ ]Alcohol lowers my inhibitions. When I drink, my inhibitions get lowered." He said it differently every time but time and time again, he said when he drinks alcohol, his inhibitions are lowered. It started with using drugs. He would drink and use cocaine, drink and smoke weed. We're in the military. That is not acceptable. He knew this about himself. He was put on notice. ["]When I drink, my inhibitions are lowered and I use drugs.["] But it wasn't just the drugs that put him on notice that when he drinks his inhibitions are lowered, it was the Article 15 he got. If you look back at that Article 15 that you have. He got an Article 15 in 2014 for drunk and disorderly. In 2014, the military put [Appellant] on notice that when he drinks, he acts in a reckless manner. Drunk and disorderly.

Look at that paperwork and you can consider it when you're considering an appropriate punishment and what the military had done to put this young man on notice that he had reckless behavior when he drank and it started back in 2014. But if that wasn't enough, if the LORs, that the Article 15 putting him on notice that you can't drink because you can't control yourself, if that wasn't enough, he should've known on July 23, 2017 when the drug use culminated, when [AB] saw him snort cocaine and immediately texted [AF]OSI. . . .

. . . .

We have drugs, two different kinds, pervasive drug use. He's in the military. It's not allowed. That doesn't stop him. You heard [BI], it's with civilians. It's with military members. It's here in Clovis. It's in Portales. It's at parties. He's having parties at his house where this is going on. Pervasive drug use. It's now led

into threats and he is on notice. He's called into [AF]OSI and it doesn't stop. The drinking continues. This is all about his choices. He chose to continue drinking. He chose to use cocaine. He chose to smoke marijuana. He chose to threaten a friend, a roommate, and a fellow Airman. And when he could've stopped it, when he had that opportunity, he didn't. Instead he kept drinking. He made that choice to continue to drink knowing that he is reckless, that he is out of control and on the 4th of July 2018, knowing that his inhibitions get lowered and he makes bad decisions, he drank all day and then decided to get out a loaded firearm. He decided to get out a loaded firearm and shoot it in the air in a neighborhood.

And again, when it wasn't firing, when it wasn't going off, when he couldn't -- you know, this family tradition couldn't come to be, he had a choice and that choice could've been ["]let me put this gun back. This is not a good idea. I've been drinking all day. I have a loaded gun. It's not firing. Let me put it back in my room. Because it was a bad choice to get it out in the first place.["] But you know what, we don't have to be here today if he had made a different choice. . . .

. . . .

Members, [Appellant] had every data point he needed to know that if he was going to drink, he was going to be reckless and that means you can't get out guns. He chose to drink but he didn't have to choose to get out a loaded firearm. He knew that. The drugs, the threats, the firearm, the shooting, the killing of his friend, he needs to be punished. He needs to be punished for all those. . . . The Air Force doesn't stand for the drug use or the reckless behavior, for threatening other [A]irmen, for bringing out loaded firearms when they're drunk . . .

In sentencing argument, the trial defense counsel also addressed Appellant's history of alcohol abuse:

[Appellant] said something profound in his unsworn statement, something that's sort of a realization. He says ["]every time I drank I didn't [get] in trouble but every time I got in trouble[,] I had been drinking.["] It's remarkable the paperwork you have in front of you. This that brought us to the court-martial, everything involves alcohol and, so, when you're looking at rehabilitative potential what is the common denominator here. Alcohol. And, so, understanding he made some choices. He made some

terrible choices that led him here. The idea that, why don't you have this alcoholic cure his alcoholism by himself. That's a bit hard to believe. So, whatever sentence that you craft, take that into consideration, the fact that he needs help. This isn't just an exercise of crushing him. If he gets a hold of alcohol, you can think about his rehabilitative potential, that he can get back on the straight and narrow.

. . . .

. . . You hear about after the 2017 incident when he confessed to [AF]OSI. Rather than getting him help, what did we do? He was placed as a confidential informant. I can't . . . help to think what if he had actually gotten help[?] What if [he] had curbed his alcoholism at that point, his [addiction]? Where would we be at this point?

### 2. Law

We review prosecutorial misconduct and improper argument de novo. *See Voorhees*, 79 M.J. at 9. When an appellant did not object at trial to trial counsel's sentencing argument, courts review for plain error. *United States v. Halpin*, 71 M.J. 477, 479 (C.A.A.F. 2013) (citing *United States v. Marsh*, 70 M.J. 101, 104 (C.A.A.F. 2011)).

> Plain error occurs when (1) there is error, (2) the error is clear or obvious, and (3) the error results in material prejudice to a substantial right of the accused. Thus, we must determine: (1) whether trial counsel's arguments amounted to clear, obvious error; and (2) if so, whether there was a reasonable probability that, but for the error, the outcome of the proceeding would have been different.

*Voorhees*, 79 M.J. at 9 (internal quotation marks and citations omitted). The burden to establish plain error, including prejudice, is on the appellant. *Id.* at 9, 12.

### 3. Analysis

Appellant asserts the circuit trial counsel's sentencing argument contained improper matters. First, Appellant claims the circuit trial counsel "blur[red] the boundary between charged and uncharged misconduct, drawing a straight line from nonjudicial punishment in 2014 to involuntary manslaughter in 2018." According to Appellant, this conduct raises two issues: "(1) the argument placed the nonjudicial punishment on par with the convicted misconduct for the purpose of sentencing; and (2) [the circuit trial counsel] essentially argued that the act of drinking itself was reckless." Additionally, Appellant asserts the

circuit trial counsel improperly conflated Appellant's "reckless" history of alcohol use with the "reckless" acts for which he was convicted. We find no error, much less plain error.

We do not agree that the circuit trial counsel implicitly or expressly implied that Appellant should be punished for uncharged misconduct, including the misconduct for which he received nonjudicial punishment. Her argument was that the nonjudicial punishment and other misconduct put Appellant on notice that his alcohol use had contributed to his misconduct, yet he continued to drink and make poor choices, culminating in Appellant shooting MJ. She argued Appellant needed to be punished for the offenses of which he was convicted: "The drugs, the threats, the firearm, the shooting, the killing of his friend, he needs to be punished. He needs to be punished for all those."

We also see no error in the circuit trial counsel describing as "reckless" Appellant's actions that were in evidence. The members already had determined legal issues of recklessness relating to the offenses. The members' duty in sentencing was to determine an appropriate sentence for Appellant, and not to make additional findings about recklessness. The circuit trial counsel's argument about Appellant's history of reckless behavior was not confusing, misleading, or unfairly prejudicial. The members were to consider all matters properly before them, including Appellant's history of misconduct involving alcohol use.

Ultimately, both the Prosecution and the Defense used Appellant's alcohol use as a theme in their sentencing arguments. The Prosecution argued Appellant was on notice that his alcohol use reduced his inhibitions and led to his criminal behavior. The Defense argued that had Appellant received help for alcoholism, he might not have made those "terrible choices." We are confident the court members punished Appellant only for the crimes of which he was convicted.

**F. Sentence Appropriateness**

Appellant claims his sentence to 14 years in confinement was inappropriately severe, noting that the maximum confinement authorized for involuntary manslaughter was 10 years and claiming that the drug and threat offenses were not particularly aggravated. Additionally, Appellant personally asks us to compare his sentence to two cases, each involving an appellant who shot a friend. Appellant does not indicate whether those appellants also were sentenced for drug crimes and communicating a threat.

**1. Law**

We review sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (footnote omitted). We may affirm only as much of

the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d), UCMJ, 10 U.S.C. § 866(d). "[T]he statutory phrase 'should be approved' does not involve a grant of unfettered discretion but instead sets forth a legal standard subject to appellate review." *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citing *United States v. Hutchison*, 57 M.J. 231, 234 (C.A.A.F. 2002), and *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999)). "Although we are accorded great discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency." *United States v. Fields*, 74 M.J. 619, 625 (A.F. Ct. Crim. App. 2015) (citing *Nerad*, 69 M.J. at 138, 146) (additional citation omitted).

During our Article 66(d), UCMJ, review of sentence appropriateness, we may, but are not required to, consider cases that are not "closely related" to Appellant's. *See United States v. Wacha*, 55 M.J. 266, 267 (C.A.A.F. 2001); *Lacy*, 50 M.J. at 288. We "are required to engage in sentence comparison only 'in those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases.'" *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (quoting *United States v. Ballard*, 20 M.J. 282, 283 (C.M.A. 1985)).

When arguing sentence disparity and asking this court to compare his sentence with the sentences of others, an appellant bears the burden to demonstrate those other cases are "closely related" to his, and if so, that the sentences are "highly disparate." *See Lacy*, 50 M.J. at 288 (citation omitted). Cases are "closely related" when, for example, they include "coactors involved in a common crime, servicemembers involved in a common or parallel scheme, or some other direct nexus between the servicemembers whose sentences are sought to be compared." *Id.* When an appellant carries this burden, or if the court raises the issue *sua sponte*, the Government must show a rational basis for the sentence disparity. *Id.*

"We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offenses, the appellant's record of service, and all matters contained in the record of trial." *Fields*, 74 M.J. at 625 (quoting *United States v. Bare*, 63 M.J. 707, 714 (A.F. Ct. Crim. App. 2006)).

### 2. Analysis

In both unpublished, sister-service cases Appellant cites, the appellant pleaded guilty to shooting a friend. One was also convicted of obstruction of justice. We do not find these cases to be closely related to Appellant's case. While we may consider the sentences in other cases even if they are not closely related to Appellant's, we decline to do so. "The appropriateness of a sentence generally should be determined without reference or comparison to sentences

in other cases." *United States v. LeBlanc*, 74 M.J. 650, 659 (A.F. Ct. Crim. App. 2015) (en banc) (citing *Ballard*, 20 M.J. at 283). Here, we find no reason to deviate from the general rule set out in *LeBlanc*.

As to his first argument—that his sentence was inappropriately severe—we have considered this particular Appellant, the nature and seriousness of the offenses, Appellant's record of service, and all matters contained in the record of trial. We find nothing particularly noteworthy about this Appellant or his service record, which pale in comparison to taking a life, threatening an Airman, and repeatedly using illegal drugs. For these offenses, Appellant faced a maximum punishment of confinement for 20 years, reduction to the grade of E-1, forfeiture of all pay and allowances, and a dishonorable discharge. Understanding we have a statutory responsibility to affirm only so much of the sentence that is correct and should be approved, Article 66(d), UCMJ, we determine the sentence is not inappropriately severe.

## G. Convening Authority's Decision on Action

Appellant requests this court "remand the case to the Chief Trial Judge to resolve a substantial issue with the convening authority's failure to take action in his decision memorandum." We decline to do so, relying on a post-trial declaration of the convening authority.

### 1. Additional Facts

The earliest offenses of which Appellant was convicted—divers use of cocaine and marijuana—occurred between 4 January 2014 and 24 July 2017. All charges and specifications against Appellant were referred to trial on 27 February 2019. Appellant's trial concluded on 1 July 2019. The court-martial sentenced Appellant to a dishonorable discharge, 14 years of confinement, and reduction to the grade of E-1.

Appellant requested clemency on 12 July 2019, specifically requesting the findings be set aside or that he receive a reduction of his sentence to confinement. The convening authority signed a Decision on Action memorandum on 26 July 2019. The convening authority did not disturb the adjudged sentence, but referenced the reduction in rank and confinement components. He stated, *inter alia*:

> 1. I hereby take no action in the case of *United States v. A1C Sean W. Harrington*.
>
> 2. . . . [U]pon completion of the sentence to confinement, AIRMAN BASIC SEAN W. HARRINGTON will be required, under Article 76a, UCMJ, to take leave pending completion of appellate review.

Appellant's circuit defense counsel received the convening authority's decision on 29 July 2019; the trial defense counsel responsible for post-trial representation received it on 31 July 2019. The military judge signed the entry of judgment on 30 July 2019, reflecting the sentence as adjudged, without modification. No party moved the military judge for a post-trial hearing claiming the convening authority's decision memorandum was incomplete, irregular, or contained error. *See* R.C.M. 1104(b)(2)(B).

Following Appellant's assignment of error, we granted the Government's motion to attach the convening authority's declaration regarding his decision to take no action.[29] In the declaration, the convening authority stated he considered, *inter alia*, Appellant's request for clemency. He stated, "After considering the submission, I determined the findings and sentence, as adjudged, were appropriate. In taking no action, my intent was to provide no relief on the findings or sentence under Article 60, [UCMJ]."

**2. Law**

"The proper completion of post-trial processing is a question of law the court reviews de novo." *United States v. Zegarrundo*, 77 M.J. 612, 613 (A.F. Ct. Crim. App. 2018) (citing *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000)).

At the time the convening authority signed the Decision on Action in this case, Air Force Instruction (AFI) 51-201, *Administration of Military Justice*, Section 13D (18 Jan. 2019), advised Air Force convening authorities to grant relief as circumscribed by the applicable version of Article 60, UCMJ.[30] For a case involving at least one convicted offense committed before 24 June 2014, AFI 51-201 reminded convening authorities to "use the version of Article 60 in effect prior to 24 June 2014" and noted they had "full discretion to grant clemency on the court-martial findings and/or sentence." AFI 51-201, ¶ 13.16.1. The instruction also equated "taking action" with "granting post-sentencing relief," explaining: "A decision to take action is tantamount to granting relief, whereas a decision to take no action is tantamount to granting no relief." AFI 51-201, ¶ 13.17.1.

Recently, the CAAF provided clear instruction to convening authorities exercising their authority under Article 60, UCMJ, 10 U.S.C. § 860. In *United*

---

[29] We consider the convening authority's declaration as necessary to resolve issues "raised by the record but [ ] not fully resolvable by the materials in the record," *United States v. Jessie*, 79 M.J. 437, 442 (C.A.A.F. 2020), namely the convening authority's intent with respect to action.

[30] Specifically, AFI 51-201, ¶ 13.16, stated: "To determine the applicable version of Article 60, look at the date of the earliest offense resulting in a conviction. The version of Article 60 in effect on that date applies to the entire case."

*States v. Brubaker-Escobar*, ___ M.J. ___, No. 20-0345, 2021 CAAF LEXIS 818 (C.A.A.F. 7 Sept. 2021), the CAAF considered the implication of a Presidential executive order relating to changes to Article 60, UCMJ, in the Military Justice Act of 2016 (MJA). The executive order stated that if an accused is found guilty of committing at least one offense before January 1, 2019:

> Article 60, of the UCMJ, as in effect on the date of the earliest offense of which the accused was found guilty, shall apply to the convening authority . . . to the extent that Article 60:
>
> (1) requires action by the convening authority on the sentence;
> . . . .
>
> . . . or
>
> (5) authorizes the convening authority to approve, disapprove, commute, or suspend a sentence in whole or in part.

Exec. Order No. 13,825, § 6(b), 83 Fed. Reg. 9889, 9890 (8 Mar. 2018).

The CAAF first found the President had the authority to designate the effective dates of the MJA, then provided a clear signpost for convening authorities going forward:

> [I]n any court-martial where an accused is found guilty of at least one specification involving an offense that was committed before January 1, 2019, a convening authority errs if he fails to take one of the following post-trial actions: approve, disapprove, commute, or suspend the sentence of the court-martial in whole or in part.

*Id.* at *1.

The CAAF applied its holding to the case before it:

> We therefore further hold that the convening authority erred by taking "no action" in this case pursuant to the new Article 60a rather than by taking one of the specified actions required under the old Article 60. However, we conclude that the convening authority's determination did not constitute plain error.

*Id.* at *4. The court found the convening authority's failure to explicitly take one of those actions was a "procedural error." *Id.* at *2, 7–8. The court then noted: "Pursuant to Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2018), procedural errors are 'test[ed] for material prejudice to a substantial right to determine whether relief is warranted.'" *Id.* at *8 (alteration in original) (quoting *United*

*States v. Alexander,* 61 M.J. 266, 269 (C.A.A.F. 2005)). Ultimately, the court found no prejudice and affirmed. *Brubaker-Escobar,* 2021 CAAF LEXIS 818, at *8.

### 3. Analysis

In light of *Brubaker-Escobar*, we find the convening authority erred when he did not explicitly "approve, disapprove, commute, or suspend the sentence in whole or in part" as required by Article 60(c)(2), UCMJ, *Manual for Courts-Martial, United States* (2012 ed.) (2012 *MCM*).

Testing this error for prejudice, we find none. We have no cause to doubt the convening authority's declaration. The convening authority correctly understood his authority to grant Appellant's clemency request, to include setting aside the findings and reducing the period of confinement. The convening authority adhered to the Air Force's guidance on taking post-trial action by stating he was taking "no action" to effectuate his decision under Article 60(c)(2), UCMJ (2012 *MCM*), to approve Appellant's adjudged sentence in full. Thus, we find no material prejudice to a substantial right of Appellant.

## H. Post-Trial Processing Delay

### 1. Additional Background

As noted above, Appellant's trial concluded on 1 July 2019, the convening authority signed a Decision on Action memorandum on 26 July 2019, and the military judge signed the entry of judgment on 30 July 2019. The court reporter certified the record of trial on 1 November 2019. The record was docketed with this court on 23 December 2019. The record is comprised of 11 volumes with 1,159 pages of trial transcript, and includes 31 prosecution exhibits, 13 defense exhibits, 1 court exhibit, and 93 appellate exhibits.

Appellant, through counsel, requested 11 enlargements of time to file his assignments of error. All were opposed by the Government, but granted by this court. After the fifth request for enlargement of time was granted, this court also granted appellate counsel's request to withdraw due to personnel turnover and appointment of a new detailed counsel—all to which Appellant consented. After an order from this court to state in future requests whether Appellant was notified of his right to submit a timely appeal and of the requested enlargement of time, in the eighth through eleventh requests for enlargement of time, Appellant's counsel asserted Appellant agreed with the request. At the same time as the ninth request for enlargement of time, Appellant's counsel moved this court to examine sealed materials, which request was granted in part 12 days later over Government opposition. In the final request for enlargement of time, filed on 5 January 2021, Appellant's counsel noted that "[o]n the date requested, 420 days will have elapsed" from docketing with this court, and that Appellant's confinement status had slowed the process.

On 26 January 2021, Appellant's counsel requested leave to file Appellant's assignments of error in excess of the court's page and word limits, which we granted without opposition. On the same date, Appellant filed his assignments of error. The Government requested one enlargement of time to file its answer, which Appellant opposed but this court granted. On 15 March 2021, after being granted its request to exceed the court's word and page limits, the Government filed its answer. On 25 March 2021, Appellant filed his reply brief. This opinion was over 18 months after Appellant's case was docketed with this court.

**2. Law**

This court reviews de novo whether an appellant's due process rights are violated because of post-trial delay. *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). In the absence of a due process violation, this court considers whether relief for excessive post-trial delay is warranted consistent with this court's authority under Article 66(d), UCMJ. *See United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002); *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016).

In *Moreno*, the CAAF established thresholds for facially unreasonable delay, including docketing with the Court of Criminal Appeals more than 30 days after the convening authority's action, and the Court of Criminal Appeals rendering a decision more than 18 months after docketing. *Moreno*, 63 M.J. at 142.

Post-trial processing of courts-martial has changed significantly since *Moreno*, to include the use of an entry of judgment before appellate proceedings can begin. *See United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020); *see also United States v. Brown*, 81 M.J. 507, 510 (A. Ct. Crim. App. 2021). This court has previously explained the consequences of updates to post-trial processing:

> [T]he specific requirement in *Moreno* which called for docketing to occur within 30 days of action no longer helps us determine an unreasonable delay under the new procedural rules. However, we can apply an aggregate standard threshold the majority established in *Moreno*: 150 days from the day Appellant was sentenced to docketing with this court.

*Livak*, 80 M.J. at 633 (citation omitted).

The test to review claims of unreasonable post-trial delay is to evaluate "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)) (other citations omitted)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Moreno*, 63 M.J. at 136 (citing *Barker*, 407 U.S. at 533).

If a court does not find that the post-trial delay was prejudicial under the fourth *Barker* factor, a due process violation only occurs when, "in balancing the other three factors, the delay is so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

**3. Analysis**

Appellant argues he is entitled to relief due to facially unreasonable post-trial-processing delays. He cites no prejudice, and we find none.

Applying *Livak*, we find a facially unreasonable delay in both the docketing with this court and this court issuing its opinion in Appellant's case. From the conclusion of trial to the docketing of Appellant's case with this court, 175 days passed, which is more than the 150 days for a threshold showing of facially unreasonable delay. From docketing with this court until this decision, over 21 months have passed, which is more than the 18 months for a threshold showing of unreasonable delay.

Having found facially unreasonable delays, we assess whether there was a due process violation by considering the four *Barker* factors. We begin with the last factor: prejudice. In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an Appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted).

We find no oppressive incarceration nor impairment of the Defense at a rehearing. *See id.* at 140. As for anxiety and concern, the CAAF has explained that "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* Appellant has articulated no such particularized anxiety in this case, and we discern none.

Turning to the other *Barker* factors, we find the length of both delays was not excessively long. The reasons for the post-trial processing delay are not extraordinary. While the record of trial is lengthy, trial counsel review alone comprised almost one-third of the time. As for appellate review, Appellant asked for delays totaling over 11 months, whereas Appellee asked only for a 14-day delay. Finally, we see no indication Appellant requested speedy post-trial processing and review. Considering all the *Barker* factors, we find neither prejudice nor any particularly egregious delay here. *See Toohey*, 63 M.J. at 362.

Appellant also asks us to exercise our authority under Article 66(d), UCMJ, to provide relief for excessive post-trial delay in the absence of a due process

violation. *See Tardif*, 57 M.J. at 225. After considering the factors enumerated in *Gay*, 74 M.J. at 744, we conclude such relief is not warranted.

## III. CONCLUSION

The approved findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.[31]

CADOTTE, Judge (concurring in the result):

I agree with the conclusion of the court approving the findings and sentence entered as correct in law and fact, and finding that no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), Uniform Code of Military Justice, 10 U.S.C. §§ 859(a), 866(d). However, I disagree with court's finding that "it was not error for the victims to provide their statements as answers to trial counsel's questions." Rule for Courts-Martial (R.C.M.) 1001(c)(5)(B) states that "[u]pon good cause shown, the military judge may permit the crime victim's counsel, if any, to deliver all or part of the crime victim's unsworn statement." Unlike my esteemed colleagues, I find R.C.M. 1001(c) does not authorize trial counsel to participate in a victim's unsworn statement. I agree with our sister court that participation by the trial counsel in a victim's unsworn statement constitutes error. *United States v. Cornelison*, 78 M.J. 739 (A. Ct. Crim. App. 2019), *rev. denied*, 79 M.J. 189 (C.A.A.F. 2019); *see also United States v. Bailey*, No. ACM 39935, 2021 CCA LEXIS 380, at *15 (A.F. Ct. Crim. App. 30 Jul. 2021) (unpub. op.). Although the majority did not find error, my colleagues found that, if error is assumed, trial counsel's participation in the victims' unsworn statements did not result in prejudice. I agree, and likewise find no prejudice to Appellant. Accordingly, I find the military judged erred by allowing trial counsel participation in the victims' unsworn statements; nevertheless, Appellant did not demonstrate he was prejudiced as

---

[31] Although not raised by Appellant, we note the statement of trial results (STR) failed to include the command that convened the court-martial as required by R.C.M. 1101(a)(3). *See United States v. Moody-Neukom*, No. ACM S32594, 2019 CCA LEXIS 521, at *4 (A.F. Ct. Crim. App. 16 Dec. 2019) (per curiam) (unpub. op.). The STR and entry of judgment also incorrectly stated that Appellant pleaded not guilty to voluntary manslaughter in violation of Article 119, UCMJ, when he entered no plea to that withdrawn charge. Appellant has not claimed prejudice and we find none. We direct the military judge, through the Chief Trial Judge, Air Force Trial Judiciary, to correct the entry of judgment before completion of the final order under R.C.M. 1209(b) and AFI 51-201, Section 14J.

a result, and I concur that the findings and sentence as entered should be approved.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court